[Crim. No. 4336. Second Dist., Div. One. June 12, 1951.]

THE PEOPLE, Respondent, v. JOHN K. HESS et al.,
Appellants.

Russell E. Parsons and Morris Lavine for Appellants.

Fred N. Howser, Attorney General, Henry A. Dietz, Assistant Attorney General, and David K. Lener, Deputy Attorney General, for Respondent.

WHITE, P. J.—In a second amended indictment returned by the Grand Jury of Los Angeles County containing 26 counts, defendants were accused in Count I with conspiracy to violate sections 424 and 504 of the Penal Code and section 16, chapter 788 of Statute 1933. This count alleged 52 overt acts. The other 25 counts consisted of specific substantive charges of violation of sections 424 and 504 of the Penal Code and section 16, chapter 788 of Statutes of 1933.

To the aforesaid second amended indictment defendants interposed a demurrer and two motions to set aside the indictment. The demurrer was sustained as to Counts XVI and XXVI without leave to amend, and they were subsequently dismissed. The motion of the district attorney to dismiss Count XIX was granted as was his motion to amend Count I by striking therefrom the words "and section 16 of chapter 788 of the statutes of 1933 of the State of California." Demurrers of the defendants to the second amended indictment were overruled except as to Counts XVI, XIX and XXVI. Motion of the defendants to vacate and set aside the second amended indictment was denied.

Each defendant pleaded not guilty and the cause proceeded to trial before a jury. During the trial defendants moved for a dismissal of all counts of the indictment under section 1385 of the Penal Code. This motion was granted as to Counts II, IV, XII, XX and XXIV of the second amended indictment. The motion as to Counts I and XX of the second amended indictment was denied. The People moved to dismiss Counts III, V, VI, VII, VIII, IX, X, XI, XIII, XIV, XV, XVII, XVIII, XXI, XXIII and XXV, which motion

was granted. On motion of the People the charge as to conspiracy to violate section 424 of the Penal Code was stricken from Count I. This left Counts I and XX as the only remaining charges against the respective defendants and, as to Count I the crime charged was limited to that of conspiracy to violate section 504 of the Penal Code.

Defendants were found guilty of the offense charged in Count I and were acquitted on Count XX.

The charges in the second amended indictment were the outgrowth of 11 transactions in which the defendants allegedly participated relative to the purchase by the state of properties for the right-of-way of the Hollywood Parkway or Freeway in the city of Los Angeles. Defendant Wheeler was a real estate broker in the city of Los Angeles and defendants Rose and Hess were California state right-of-way agents. The charging portion of Count I of the second amended indictment upon which defendants were convicted reads as follows:

"The Grand Jury of the County of Los Angeles hereby accuses JOHN K. HESS, WILLIAM E. ROSE and ROYALL W. WHEELER of a felony, to wit, the crime of CONSPIRACY TO VIO-LATE ~~SECTION 424, PENAL CODE OF CALIFORNIA~~ and, SECTION 504 PENAL CODE OF CALIFORNIA ~~AND SECTION 16 OF CHAPTER 788 OF THE STATUTES OF 1933 OF THE STATE OF CALIFORNIA,~~ in that about the year 1943, and continuously thereafter, in the County of Los Angeles, State of California, the above named defendants, JOHN K. HESS, WILLIAM E. ROSE and ROYALL W. WHEELER, and other persons whose true names are to the Grand Jury unknown, did wilfully, unlawfully and feloniously conspire, combine, confederate and agree together, ~~that officers of this State and other persons charged with the receipt, safekeeping, transfer and disbursement of public moneys, would, without authority of law, be caused to appropriate said public moneys and portions of said public moneys to the use of said State officers and to the use of said other persons charged with said receipt, safekeeping, transfer and disbursement of said public moneys; and else, to the use of other persons than said State officers and persons so charged with the said receipt, safekeeping, transfer and disbursements of said public moneys, and~~ that the said defendants, JOHN K. HESS, WILLIAM E. ROSE and ROYALL W. WHEELER, and their co-conspirators would cause officers of this State and deputies, clerks and servants of such State officers to fraudulently appropriate to uses and purposes not in the due and lawful

execution of the trust of said State officers and said deputies, clerks and servants of said State officers, public moneys, ~~property~~ which said State officers and said deputies, clerks and servants of said State officers had in their possessions and under their control, by virtue of the trust of said State officers and said deputies, clerks and servants of said State officers; ~~and that said defendants, JOHN K. HESS, WILLIAM E. ROSE and ROYALL W. WHEELER, and their co-conspirators would cause officers and employees of the Department of Public Works of the State of California to corruptly perform official acts of said officers and employees to the injury of the State.~~"

After the rendition of the guilty verdicts defendants moved to set aside such verdicts on the ground that they had been once in jeopardy by reason of the claimed illegal discharge of a juror during jury deliberations without the consent and over the objections of the defendants and the substitution of another juror in her place. Defendants moved to set aside the verdicts and dismiss the indictment on the ground that Count I of the second amended indictment, as amended, was barred by the statute of limitations. Defendants moved for a new trial and in arrest of judgment; they moved for entry of judgment of acquittal on the grounds of the aforesaid claimed illegal discharge of a juror. All these motions were denied.

Judgments were pronounced against defendants Hess and Rose, but as to defendant Wheeler, proceedings were suspended and he was placed on probation upon certain terms and conditions. As to him, therefore, the attempted appeal from the judgment must be dismissed and his appeal considered only as to the order denying him a new trial. Defendants Rose and Hess appeal from the judgments of conviction, as well as from the order denying their motion for a new trial.

Although the record contains some 22 transactions in which the appellants are charged with overt acts of alleged embezzlement of public funds, only the overt acts from 1 to 4, inclusive; 33 to 38, inclusive; 21 to 26, inclusive; 5 to 8, inclusive; and 39 to 46, inclusive were argued to the jury, so we deem it unnecessary to here set forth the overt acts other than those above mentioned. They are as follows:

"OVERT ACT No. 1

"That pursuant to said combination, confederacy, agreement and conspiracy, and to carry out the objects and the purposes of the same, the defendant, ROYALL W. WHEELER,

on or about the 1st day of September, 1943, at and in the County of Los Angeles, State of California, talked to Leslie W. Hope and Sarah E. Hope concerning the sale of certain real property located at 427-431 and 3/4 Virgil Street in the City of Los Angeles, County of Los Angeles, State of California.

### "OVERT ACT No. 2

"That pursuant to said combination, confederacy, agreement and conspiracy, and to carry out the objects and the purposes of the same, the defendant, ROYALL W. WHEELER, on or about the 25th day of October, 1943, at and in the County of Los Angeles, State of California, received One Thousand Dollars ($1,000.00), lawful money of the United States, in connection with the transaction mentioned in Overt Act No. 1.

### "OVERT ACT No. 3

"That pursuant to said combination, confederacy, agreement and conspiracy, and to carry out the objects and the purposes of the same, the defendant, ROYALL W. WHEELER, on or about the 27th day of October, 1943, at and in the County of Los Angeles, State of California, obtained a cashier's check in the amount of Four Hundred Dollars ($400.00) lawful money of the United States, made payable to 'W. E. Rose or John Hess', in connection with the transaction mentioned in Overt Act No. 2.

### "OVERT ACT No. 4

"That pursuant to said combination, confederacy, agreement and conspiracy and to carry out the objects and the purposes of the same, the defendant, JOHN K. HESS, on or about the 28th day of October, 1943, at and in the County of Los Angeles, State of California, endorsed the cashier's check mentioned in Overt Act No. 3.

### "OVERT ACT No. 33

"That pursuant to said combination, confederacy, agreement and conspiracy, and to carry out the objects and the purposes of the same, the defendant, ROYALL W. WHEELER, on or about the 1st day of February, 1944, at and in the County of Los Angeles, State of California, talked to John P. Auer and Saima Auer concerning the sale of certain real property located at 4420-4424 Melrose Avenue and 654-660½ North Alexandria, in the City of Los Angeles, County of Los Angeles, State of California.

## "Overt Act No. 34

"That pursuant to said combination, confederacy, agreement and conspiracy, and to carry out the objects and the purposes of the same, the defendant ROYALL W. WHEELER, on or about the 27th day of March, 1944, at and in the County of Los Angeles, State of California, received the amount of Three Thousand Five Hundred Dollars ($3,500.00), lawful money of the United States, in connection with the transaction mentioned in Overt Act No. 33.

## "Overt Act No. 35

"That pursuant to said combination, confederacy, agreement and conspiracy, and to carry out the objects and the purposes of the same, the defendant, ROYALL W. WHEELER, on or about the 27th day of March, 1944, at and in the County of Los Angeles, State of California, obtained a cashier's check in the amount of Seven Hundred Dollars ($700.00), lawful money of the United States, made payable to 'W. E. Rose' in connection with the transaction mentioned in Overt Act No. 34.

## "Overt Act No. 36

"That pursuant to said combination, confederacy, agreement and conspiracy, and to carry out the objects and the purposes of the same, the defendant, ROYALL W. WHEELER, on or about the 27th day of March, 1944, at and in the County of Los Angeles, State of California, obtained a cashier's check in the amount of Seven Hundred Dollars ($700.00), lawful money of the United States, made payable to 'John Hess' in connection with the transaction mentioned in Overt Act No. 34.

## "Overt Act No. 37

"That pursuant to said combination, confederacy, agreement and conspiracy, and to carry out the objects and the purposes of the same, the defendant, WILLIAM E. ROSE, on or about the 28th day of March, 1944, at and in the County of Los Angeles, State of California, endorsed the cashier's check mentioned in Overt Act No. 35.

## "Overt Act No. 38

"That pursuant to said combination, confederacy, agreement and conspiracy, and to carry out the objects and the purposes of the same, the defendant, JOHN K. HESS, on or about the 28th day of March, 1944, at and in the County of Los Angeles, State of California, endorsed the cashier's check mentioned in Overt Act No. 36."

"Overt Act No. 21

"That pursuant to said combination, confederacy, agreement and conspiracy, and to carry out the objects and the purposes of the same, a representative of the defendant, ROYALL W. WHEELER, on or about the 1st day of August, 1944, at and in the County of Los Angeles, State of California, talked to Virginia W. Pannill concerning the sale of certain real property located at 823-825 North Ardmore Avenue, in the City of Los Angeles, County of Los Angeles, State of California.

"Overt Act No. 22

"That pursuant to said combination, confederacy, agreement and conspiracy, and to carry out the objects and the purposes of the same, the defendant, ROYALL W. WHEELER, on or about the 17th day of October, 1944, at and in the County of Los Angeles, State of California, received the amount of Five Hundred Twenty-five Dollars ($525.00), lawful money of the United States, in connection with the transaction mentioned in Overt Act No. 21.

"Overt Act No. 23

"That pursuant to said combination, confederacy, agreement and conspiracy, and to carry out the objects and the purposes of the same, the defendant, ROYALL W. WHEELER, on or about the 17th day of October, 1944, at and in the County of Los Angeles, State of California, obtained a cashier's check in the amount of One Hundred Five Dollars ($105.00), lawful money of the United States, made payable to 'John Hess' in connection with the transaction mentioned in Overt Act No. 22.

"Overt Act No. 24

"That pursuant to said combination, confederacy, agreement and conspiracy, and to carry out the objects and the purposes of the same, the defendant, JOHN K. HESS, on or about the 18th day of October, 1944, at and in the County of Los Angeles, State of California, endorsed the cashier's check mentioned in Overt Act No. 23.

"Overt Act No. 25

"That pursuant to said combination, confederacy, agreement and conspiracy, and to carry out the objects and the purposes of the same, a representative of the defendant, ROYALL W. WHEELER, on or about the 1st day of October, 1944, at and in the County of Los Angeles, State of California, talked to Mamie K. Graham concerning the sale of certain real prop-

erty located at 1257 North Western Avenue, in the City of Los Angeles, County of Los Angeles, State of California.

"OVERT ACT No. 26

"That pursuant to said combination, confederacy, agreement and conspiracy, and to carry out the objects and the purposes of the same, the defendant, ROYALL W. WHEELER, on or about the 20th day of December, 1944, at and in the County of Los Angeles, State of California, received the amount of One Thousand Three Hundred Fifty Dollars ($1,350.00), lawful money of the United States, in connection with the transaction mentioned in Overt Act No. 25."

"OVERT ACT No. 5

"That pursuant to said combination, confederacy, agreement and conspiracy, and to carry out the objects and the purposes of the same, the defendant, ROYALL W. WHEELER, on or about the 19th day of November 1943, at and in the County of Los Angeles, State of California, talked to trustees and legal representatives of the Estate of Charles Crary concerning the sale of certain real property located at 535-545 North Vermont Avenue, in the City of Los Angeles, County of Los Angeles, State of California.

"OVERT ACT No. 6

"That pursuant to said combination, confederacy, agreement and conspiracy, and to carry out the objects and the purposes of the same, the defendant, ROYALL W. WHEELER, on or about the 28th day of January, 1944, received One Thousand Fifty Dollars ($1,050.00), lawful money of the United States, in connection with the transaction mentioned in Overt Act No. 5.

"OVERT ACT No. 7

"That pursuant to said combination, confederacy, agreement and conspiracy, and to carry out the objects and the purposes of the same, the defendant, ROYALL W. WHEELER, on or about the 29th day of January, 1944, at and in the County of Los Angeles, State of California, obtained a cashier's check in the amount of Four Hundred Twenty Dollars ($420.00) lawful money of the United States, made payable to 'John Hess or W. E. Rose' in connection with the transaction mentioned in Overt Act No. 6.

"OVERT ACT No. 8

"That pursuant to said combination, confederacy, agreement and conspiracy, and to carry out the objects and the pur-

poses of the same, the defendant, WILLIAM E. ROSE, on or about the 29th day of January, 1944, at and in the County of Los Angeles, State of California, endorsed the cashier's check mentioned in Overt Act No. 7.''

"OVERT ACT No. 39

"That pursuant to said combination, confederacy, agreement and conspiracy, and to carry out the objects and the purposes of the same, a representative of the defendant, ROYALL W. WHEELER, on or about the 1st day of July, 1944, at and in the County of Los Angeles, State of California, talked to Elizabeth Russell Hiam concerning the sale of certain real property located at 827-829 North Ardmore Avenue, in the City of Los Angeles, County of Los Angeles, State of California.

"OVERT ACT No. 40

"That pursuant to said combination, confederacy, agreement and conspiracy, and to carry out the objects and the purposes of the same, the defendant, ROYALL W. WHEELER, on or about the 12th day of July, 1944, at and in the County of Los Angeles, State of California, purchased a cashier's check in the amount of Two Thousand Dollars ($2,000.00) lawful money of the United States, and gave said cashier's check in the amount of Two Thousand Dollars ($2,000.00), lawful money of the United States, to Mrs. Elizabeth Russell Hiam in connection with the purchase of the property referred to in Overt Act No. 39.

"OVERT ACT No. 41

"That pursuant to said combination, confederacy, agreement and conspiracy, and to carry out the objects and the purposes of the same, the defendant, ROYALL W. WHEELER, on or about the 12th day of July, 1944, at and in the County of Los Angeles, State of California, purchased the property referred to in Overt Act No. 39 in the names of Christopher C. and Margaret Spohr, relatives of the defendant, ROYALL W. WHEELER.

"OVERT ACT No. 42

"That pursuant to said combination, confederacy, agreement and conspiracy, and to carry out the objects and the purposes of the same, the defendant, ROYALL W. WHEELER, on or about the 8th day of September, 1944, at and in the County of Los Angeles, State of California, received the amount of Four Hundred Twelve Dollars and Fifty Cents ($412.50),

lawful money of the United States, in connection with the transaction mentioned in Overt Act No. 39.

## "Overt Act No. 43

"That pursuant to said combination, confederacy, agreement and conspiracy, and to carry out the objects and the purposes of the same, the defendant, Royall W. Wheeler, on or about the 11th day of September, 1944, at and in the County of Los Angeles, State of California, obtained a cashier's check in the amount of One Hundred Fifty Dollars ($150.00), lawful money of the United States, made payable to 'W. E. Rose' in connection with the transaction mentioned in Overt Act No. 42.

## "Overt Act No. 44

"That pursuant to said combination, confederacy, agreement and conspiracy, and to carry out the objects and the purposes of the same, the defendant, Royall W. Wheeler, on or about the 11th day of September, 1944, at and in the County of Los Angeles, State of California, obtained a cashier's check in the amount of One Hundred Fifty Dollars ($150.00), lawful money of the United States, made payable to 'John K. Hess' in connection with the transaction mentioned in Overt Act No. 42.

## "Overt Act No. 45

"That pursuant to said combination, confederacy, agreement and conspiracy, and to carry out the objects and the purposes of the same, the defendant, William E. Rose, on or about the 12th day of September, 1944, at and in the County of Los Angeles, State of California, endorsed the cashier's check mentioned in Overt Act No. 43.

## "Overt Act No. 46

"That pursuant to said combination, confederacy, agreement and conspiracy, and to carry out the objects and the purposes of the same, the defendant, John K. Hess, on or about the 12th day of September, 1944, at and in the County of Los Angeles, State of California, endorsed the cashier's check mentioned in Overt Act No. 44."

During the trial the People introduced evidence as to the procedure employed to acquire rights-of-way by the Department of Public Works, Division of Highways, State of California, and particularly the right-of-way of the aforesaid Hollywood Parkway or Freeway. First, the alignment is determined and a right-of-way map prepared showing the

parcels of land to be acquired. Right-of-way agents prepare the allotment appraisal, sometimes reviewed by the district right-of-way agent and the supervising agent. Upon preparing the appraisal, the negotiating right-of-way agent to whom the matter is assigned recommends the approval of his appraisal. The appraisal report is approved by District Right-of-Way Agent E. N. Whittemore, District Engineer S. V. Cortelyou, and Supervising Right-of-Way Agent E. F. Wagner. It is further approved in Sacramento by the head Right-of-Way Agent, Frank C. Balfour, or his assistant, Raymond S. Pianezzi, and returned to the district office with authorization to negotiate for acquisition of the property. A "title dope sheet" is prepared indicating to the agent the conditions of the title acceptable to the department and the conditions that must be cleared or eliminated from the title. One of the department engineers prepares a grant deed, after receipt of a title report from the department title examiner, and the negotiating right-of-way agent is given a copy of the "title dope sheet," the deed, and the right-of-way contract. He then contacts the property owner and obtains the executed right-of-way contract and the deed. The aforesaid Mr. Wagner and Mr. Balfour testified that all right-of-way agents were instructed to deal directly with the property owners, not to negotiate through real estate brokers or attorneys unless the owners so insisted, and to acquire the property on the best possible terms.

The right-of-way agent indicates recommendation for approval of the contract in a place provided in the left-hand margin of the contract and prepares a memorandum to the district right-of-way agent explaining the reason why the state should enter into the contract and why the district right-of-way agent should approve. Upon the approval of the district right-of-way agent, further approval is obtained from the district engineer and from the Sacramento office, and the contract is finally executed by the district engineer as agent for the state. A duplicate thereof is mailed to the property owner. A bill or demand is mailed to the property owner or delivered to him by the contacting agent. The property owner signs the demand for the payment of the consideration by the state and the bill or demand, the original deed or a certified copy, and the title report are sent to the Sacramento office with a claim schedule supported by the foregoing documents, which are processed through the headquarters at the right-of-way office at Sacramento, and eventually to the Controller who issues a

state warrant out of highway funds. The warrant is returned to the district with a remittance advice slip. The district title examiner indicates on the remittance advice slip that it is satisfactory to release the check. It then goes to the right-of-way agent who originally negotiated the transaction, and in most cases the agent who made the appraisal has the final say in releasing the check to the owner upon said agent's "O.K."— by his initials together with the date of the release. Supervising Right-of-Way Agent Wagner further testified that oral instructions were given to all right-of-way agents not to release the warrant until the right-of-way agent who handled the original transaction gives his "O.K." by placing his initials on the remittance advice slip.

In the particular transactions here involved the record reveals the following:

### HOPE TRANSACTION

#### (Overt Acts 1 to 4, aforesaid)

Defendants Hess and Rose were the negotiating right-of-way agents. They were given a right-of-way map containing a delineation of the Hope property prepared in January, 1942. A title report was prepared June 1, 1943; a grant deed June 4, 1943, and both given to defendants Hess and Rose a day or two thereafter. On June 10, 1943 defendants Hess and Rose prepared the allotment appraisal.

Pursuant to a letter from defendant Wheeler, a neighborhood real estate broker doing business as the Home Realty Company, received a few days prior thereto, Mr. Hope gave defendant Wheeler written authorization dated June 19, 1943, to make a survey and appraisal for the purpose of negotiating with the state, defendant Wheeler to receive a 5 per cent commission upon the procural of an approved purchase report. Mr. Hope wanted $20,000 net for the property. Mr. Hope testified that he did not meet defendants Rose and Hess for a month or more after the written authorization to defendant Wheeler. In response to the question, "Mr. Hope, had Mr. Rose and Mr. Hess contacted you prior to the time you signed this selling authorization of June 19, 1943, would you have sold that North Virgil Street property to the State of California for $20,000?", he testified: "Well, I would classify them as any other broker or any other person. If I had been approached and had been offered the amount that I was hoping to get, I might have made the sale to someone else regardless of who it was, I mean before I had contracted with Mr.

Wheeler. There was other brokers that I had discussed the problem or the sale with prior, I am quite sure, so I might or I probably would have made a sale to anyone that gave me— offered me my price.''

September 16, 1943, the grant deed and the right-of-way contract were executed and on September 17, 1943, defendant Rose prepared a memorandum recommending purchase by the state for $21,000. October 21, 1943, defendant Rose wrote on the remittance advice slip, ''Okay to .release check 10-21-43, W.E.R.'' Mr. Hope received the state warrant for $21,000 October 22, 1943, and deposited it in his bank account and gave defendant Wheeler a personal check for $1,000. October 25, 1943, defendant Wheeler deposited the check in the Home Realty Company bank account. October 27, 1943, defendant Wheeler purchased a cashier's check for $400 payable to W. E. Rose or John Hess. Defendant Hess endorsed the cashier's check. Two hundred dollars was deposited in the savings account of J. J. and J. F. Hess, father and brother of John K. Hess.

CRARY TRANSACTION

(Overt Acts 5 to 8, aforesaid)

The right-of-way map containing a delineation of the Crary property was prepared in January, 1942. The allotment appraisal was prepared November 15, 1943. On November 19, 1943, the Crary brothers gave defendant Wheeler written authority to sell the property. Allan H. Crary testified that he did not learn the state was to be the purchaser until approximately 15 days thereafter. Allan H. Crary first met Mr. Hess sometime subsequent to November 29th; he had never met Mr. Rose. His brother was ill and unable to attend court as a witness but it was stipulated that he would testify that at the date the selling authorization was signed he did not know that the state was going to purchase the property.

The right-of-way contract between the state and the Crarys was approved on the recommendation of defendant Hess December 6, 1943, and more than four months thereafter the allotment appraisal was approved on April 7, 1944. State Right-of-Way Agent Wagner testified that ''the instructions were that the negotiating agents were not to enter into any negotiations with the property owners until after the allotment appraisal had been approved in Sacramento and the district was advised, unless the agent was able to show that it was very advantageous for the state to acquire a particular

piece of property, then under instructions from Sacramento they could negotiate it prior to completing their appraisal.'' December 13, 1943, defendant Hess prepared a memorandum recommending the acquisition of the Crary property and falsely stated that the grantors had a sale pending to another private party. January 26, 1944, Hess okayed the release of the state warrant in the sum of $21,000 to the Crarys. January 28, 1944, the Crarys drew a check in the sum of $1,050 payable to the Home Realty Company as commission in negotiating the sale to the state. January 29, 1944, Wheeler obtained a cashier's check in the sum of $420 payable to John Hess or W. E. Rose. Defendant Rose endorsed the check and it was cashed February 1, 1944, and debited to the account of the Home Realty Company.

The People asked Allan H. Crary if Mr. Rose or Mr. Hess had contacted him with reference to the sale prior to the written authorization to defendant Wheeler, would he have sold directly to the state, to which he replied: ''We would have done so because it was our duty to get the most money we could for the trust.''

### AUER TRANSACTION
#### (Overt Acts 33 to 38, aforesaid)

The right-of-way map containing a delineation of the Auer property was prepared in November, 1943, and it was the policy of the department to give the right-of-way map to the negotiating agents, in this case defendants Hess and Rose, shortly after its preparation.

January 15, 1944, a title report was prepared and January 14, 1944 a title ''dope sheet'' was prepared. It was the policy of the department to give copies thereof to the negotiating agents a day or two after the preparation of the title ''dope sheet.''

A rough draft of the grant deed was prepared January 25, 1944. It was the policy of the department to have the rough draft of the deed typed up in a day or two and given to the negotiating agents.

February 4, 1944, defendants Hess and Rose prepared an allotment appraisal for $76,400.

February 9, 1944, Mr. Wheeler visited Mrs. Auer, who had not met Mr. Wheeler prior to that time, and asked her if the Auers would sell the property for $75,000 cash. She first told him the property was not for sale and then said she would talk it over with her husband. February 10, 1944, Mr. Wheeler

and Mr. Hess called on the Auers. Mr. Hess did not identify himself as being connected with the state. Mr. Wheeler gave the Auers a check for $2,000 and they signed a selling authorization agreement providing for a selling price of $75,000 and a 5 per cent commission.

February 11, 1944, in accordance with the instructions of defendant Wheeler or defendant Hess, the Auers went to the bank to open the escrow. There they met all three defendants, and for the first time the Auers learned that the state was to be the purchaser. They signed the escrow instructions, as did defendant Hess.

February 10, 1944, defendant Hess had written to the Western Service Corporation with reference to the Auer transaction. Defendants Hess and Rose called on the Auers after the opening of the escrow and told them that Western Service Corporation wanted $2,000 as a bonus to accept payment of the mortgage on their property; the Auers told them they did not want to pay the bonus and to cancel the whole deal. Defendants Hess and Rose came the next day and said it was now $1,000. The Auers hesitated and after Auer talked with his wife he said they would split the amount and Hess said he would arrange some other way to pay the other half. The Auers signed additional escrow instructions agreeing to pay the $500 bonus.

The escrow officer testified that on February 11, 1944, defendants Wheeler and Hess conferred with him at the bank with reference to the contents of the escrow instructions.

The right-of-way contract was dated February 14, 1944, and was recommended for approval by defendant Hess. February 15, 1944, in a memorandum to the district engineer, defendant Hess stated that the Auers had a sale pending to a private purchaser for $75,000; that ''The State's needs were explained and grantors agreed to sell the real property and improvements to the State for $70,000.00, provided the transaction could be completed at once and also a buyer could be found to take the furniture at $5,000.00. We were successful in securing a purchaser for this personal property at the stipulated price, who will take over the entire property on a master lease for a term of three years, the State having the right to terminate the lease on ninety days' notice at any time beginning in the third year of the lease. Inasmuch as this property is now offered for sale by its owners at a fair open market value and will be sold to a private individual if the State does not acquire now, it would seem advisable to complete

the transaction at this time and avoid possible speculation in the area . . .".

On March 10, 1944, defendant Hess okayed the release of the state warrant in the amount of $70,000 on the remittance advice slip. On March 21, 1944, after a conversation with the escrow officer, defendant Wheeler signed additional escrow instructions. Defendant Wheeler agreed to the deduction of $250 from sums the Home Realty Company was to receive out of the escrow, the said $250 to be applied or credited to the Auers, to apply on a bonus to be paid to the Western Service Corporation.

On March 24, 1944, the Auer escrow was closed and on the same date, defendants Hess and Rose wrote to the district engineer relative to the allotment appraisal. The allotment appraisal was not approved by the superior officers of defendants Hess and Rose until April 7, 1944, almost two months after the right-of-way contract was entered into, which constituted a violation of the instructions given to right-of-way agents.

On March 27, 1944, a check dated March 25, 1944, in the sum of $5,500 was deposited to the account of Home Realty Company. On the same day defendant Wheeler made application for cashier's checks in the sum of $700 each to Hess and Rose, which cashier's checks were cashed by Hess and Rose.

PANNILL TRANSACTION

(Overt Acts 21 to 26, aforesaid)

The right-of-way map containing a delineation of the Pannill property was prepared in November, 1943. The allotment appraisal was dated July 31, 1944, and approved by defendants Hess and Rose.

Mrs. Pannill testified that Mr. Myers, a real estate agent in defendant Wheeler's office, had called on her and that several days later he returned, at which time she signed the right-of-way contract dated August 11, 1944, which he presented to her. Several days thereafter, defendant Hess visited her and stated he was from the state highway department and that he came to see about her property. She told him Mr. Myers had been there and defendant Hess asked whether she wanted to do business with Myers. She replied there was no alternative since she had signed the right-of-way contract with Myers. She did not know there was anyone else taking care of the business. The demand on the state signed by Mrs. Pannill was for $10,500, $7,975.70 payable to her and $2,524.30

to the California Bank. Defendant Rose okayed the release of the warrant on the remittance advice slip.

On October 16, 1944, Mr. Myers delivered the warrant to Mrs. Pannill and she gave him a check for $525 payable to the Home Realty Company as commission. The check for $525 was deposited to the account of the Home Realty Company on October 17, 1944 and on the same day defendant Wheeler purchased a cashier's check in the sum of $105 payable to defendant Hess, which Hess cashed.

### HIAM-SPOHR TRANSACTION
#### (Overt Acts 39 to 46, aforesaid)

The right-of-way map containing a delineation of the Hiam property was prepared in November, 1943. On January 18, 1944, the title report was prepared. February 10 or 11th, 1944, a grant deed was prepared in the name of Elizabeth Russell Hiam. July 11, 1944, defendants Hess and Rose appraised the Hiam property and listed it as owned by Christopher C. Spohr for $9,150.

Two or three weeks prior to July 12, 1944, Mrs. Hiam had phoned the Home Realty Company and said, "I wanted my property to be sold, that I wanted to put my property on the market to sell." She wanted $8,500. A salesman came to her home and told her a party was interested for $8,000. The next day Mrs. Hiam found an apartment and she called Mr. Wheeler and told him she would split the difference and accept $8,250. July 11, 1944, defendant Wheeler gave her a cashier's check for $2,000, purchased by the Home Realty Company. The Hiam-Spohr escrow instructions were signed July 12, 1944, at which time the escrow was opened. Sometime prior to the opening of the escrow, defendants Wheeler and Hess informed the escrow officer that the escrow was coming in. Mr. Wheeler told Mrs. Hiam it was to be a 60-day escrow to await money expected from the east. Mr. Wheeler gave the escrow officer the information contained in the escrow instructions and took them out to be signed. The escrow instructions signed by the Spohrs were either returned by Mr. Wheeler in person or mailed to the escrow officer by Mr. Spohr. The escrow officer did not meet the Spohrs, nor did Mrs. Hiam. Defendant Wheeler informed the escrow officer that $2,000 had been paid outside escrow for the purchase of the property, and that the additional $6,250 was to be paid through the escrow. Also dated July 12, 1944, is People's Exhibit 154, which is an acceptance agreement on the stationery of the Home Realty

Company signed "Home Realty Company, by R. W. Wheeler" and accepted by C. C. Spohr, buyer, and accepted by Elizabeth Russell Hiam.

Christopher Spohr is defendant Wheeler's father-in-law. He testified that he did not know defendants Rose and Hess, that he did not know Mrs. Hiam, and that he had never met her. He further testified that he did not go to the bank to sign the escrow instructions but that they were brought to his home by defendant Wheeler or his wife. Defendant Wheeler also brought the state right-of-way contract to his home. Mr. Spohr did not recall receipt of the escrow checks, but he and his wife endorsed them and turned them over to defendant Wheeler. Mr. Spohr went by the Hiam property but he did not go inside. He thought he might possibly live there. Defendant Wheeler told him that if he bought the property through a broker it would be worth more money.

With reference to the Spohr-State escrow, the escrow officer at the bank testified that defendants Wheeler and Hess conferred with him concerning the escrow instructions. He could not recall "whether it was before this second deal was opened or whether it was before the first deal was opened, but it was some time at least before the second escrow was opened."

On July 14, 1944, defendant Wheeler wrote the escrow officer a letter marked "Personal. Not for your file." stating he had made arrangements with Hess relative to the escrow charges. The escrow officer received the state documents for the escrow files from defendant Hess.

The escrow instructions in the Spohr-state escrow are dated July 15, 1944. One of the provisions appearing therein is as follows: "You will transfer sufficient funds to your Escrow No. 113-14044-B (the Hiam-Spohr escrow) to meet my money requirements therein," which provision was contained therein on the instructions of defendant Wheeler to the escrow officer. The right-of-way contract between the Spohrs and the state is also dated July 15, 1944, and was recommended for approval by defendant Hess.

On July 24, 1944, Mr. Pianezzi returned the right-of-way contract to Mr. Cortelyou unapproved as it was submitted prior to the submission and approval of the appraisal report and in his letter of transmittal he called attention to Mr. Balfour's previous letter requesting that papers be held until the appraisal report had been completed and approved. Mr. Whittemore testified that he read the letter and referred it to

Mr. Hess with the instructions to prepare an answer for Mr. Whittemore's signature. Said answer was dated July 27, 1944, and called attention ''to the circumstances in this case, which are somewhat unusual.'' The letter continues:

''In the normal verbal discussion in acquisition matters, held in this instance quite some time prior to the receipt of Mr. Balfour's letter of July 6th, agreement was made to acquire this parcel and papers were drawn, although it is true that contracts were dated July 15th and received in our office subsequent to receipt of Mr. Balfour's letter.

''The situation is that Mr. and Mrs. Spohr, grantors, had purchased this parcel from the former owner, Elizabeth Russell Hiam, under an unrecorded agreement to convey, but had not at the time we approached them received the deed to the property. As soon as they found the State desired the property for highway purposes, they agreed to deed to the State and promptly went to considerable trouble to relocate themselves.

''They succeeded in finding a satisfactory property and requested us to enter escrow opened with the Security-First National Bank of Los Angeles, which we did. Deed from Elizabeth Russell Hiam to the Spohrs, dated July 13, 1944, was also filed in this escrow and properly certified copy furnished our office. Parties from whom the Spohrs are purchasing other property have also entered escrow.

''In justice to the Spohrs, we believe subject contract should be approved immediately, as they have gone out of their way to cooperate with the State and have completed their part of the escrow. As the Spohrs must use the proceeds from Parcel 327 to pay for the new property, if approval of the contract cannot be had now so that payment from the State may be deposited in escrow soon, Spohrs' new grantors may withdraw from escrow and accept another offer where payment will be immediate. This would, to say the least, create a very bad situation in a right-of-way area just opening and would have a tendency to make other transactions in this locality very difficult.

''The appraisal work on this area is very nearly completed, as was pointed out in memorandum of July 17 to S. V. Cortelyou from John K. Hess, submitting this transaction. As soon as photographic prints can be obtained and certain other details completed, the appraisal covering the entire area will be forwarded Central Office for approval.

"Considering the exceptional circumstances cited, we again forward the papers to you for review and respectfully request that you reconsider the matter of immediate approval of this contract."

The Spohr-state escrow file showed deposit of the state warrant in the sum of $8,750 on August 15, 1944. The allotment appraisal was approved at Sacramento August 25, 1944, and on the same day, defendant Hess okayed the release of the state warrant for $8,750.

On September 2, 1944, in accordance with the previous instructions of defendant Wheeler, $6,218.86 was transferred from the Spohr-state escrow to the Hiam-Spohr escrow. On the same day an escrow check was made payable to the Spohrs in the sum of $2,515.89 and another escrow check was made payable to the Home Realty Company in the sum of $412.50, the latter of which was deposited to the account of the Home Realty Company on September 8, 1944. The check for $2,515.89 was endorsed by the Spohrs and given to defendant Wheeler, and subsequently cashed. On September 8, 1944, a total of $3,234.39 was deposited to the account of the Home Realty Company. September 11, 1944, defendant Wheeler purchased a cashier's check payable to defendant Rose in the sum of $150 and a cashier's check payable to defendant Hess in the sum of $150. The check to defendant Rose was cashed September 13, 1944, and $75 of the check to defendant Hess was received in cash and $75 deposited to the account of the father and brother of Hess.

As a first ground of appeal, it is contended that the selection of the jury panel was not in conformity with the law governing the method of securing jury panels, and that the selection of the panel in the instant case was in violation of due process of law guaranteed by the 14th amendment to the Constitution of the United States.

Section 198 of the Code of Civil Procedure sets forth who is competent to act as a juror, while section 199 of the same code designates those persons who are not competent to act as jurors. Section 200 of the Code of Civil Procedure designates those who are exempt from jury service. Section 201 of the same code sets forth the considerations governing the excuse of jurors otherwise eligible for service. While this section provides that a juror shall not be excused for "slight or trivial causes, or for hardship, or for inconvenience to said juror's business," it does nevertheless invest a wide discretion in the court and jury commissioner, in excusing, for good

cause those summoned for jury duty, the latter acting as an attaché of the judicial system of the state to enable the court to transact its judicial work in an orderly and expeditious manner.

Section 204a of the Code of Civil Procedure specifically authorizes the superior court in certain counties, "whenever in their opinion the business of the court requires it," to "in their discretion, appoint a jury commissioner . . . to assist the judges thereof in making selections of trial jurors. . . ."

Section 204b of the Code of Civil Procedure provides that the jury commissioner shall annually "furnish the judges of the court a list of persons qualified to serve as trial jurors or grand jurors during the ensuing year." That, "a majority of the judges of the court may, from time to time, adopt such rules and instructions as may be necessary for the guidance of the jury commissioner, who shall at all times be under the supervision and control of the judges of the court."

The record herein shows that the jury commissioner selected the jurors on the panel here under consideration, under the guidance and direction, and pursuant to a method provided by the judges of the superior court. The names of jurors for the year here in question were taken from the last published registered voters list of Los Angeles County. The entire registration was taken. Each precinct list averaged between 300 and 350 names. Each fifth precinct was selected, i. e., if the commissioner started with precinct two he would take precincts, 7, 12, 17 and so on. From the precinct lists each ninth name would be selected. Depending upon the year, the name selected would begin with the first, second, or subsequent name on the list. These names are then listed and they approximate a list of some 35,000 names. In selecting the names from the precinct lists there is no discrimination made between men and women, single or married, poor or well-to-do, or occupation. A letter is then sent to each of those on this list to report for examination. Six hundred letters a day are sent out. Of this list some 3,500 were selected for jury duty. The others were eliminated by interview after personal appearances before any one of three judicial secretaries although the entire staff of some six judicial secretaries would work on the selection. A prospective juror was not excused, after reporting for examination by the jury commissioner, on the ground of race, creed, color, sex, occupation, religion or wealth. Each prospective juror in preparation for interview by the

jury commissioner fills out a data sheet provided by the jury commissioner's office. The code provisions are used for the purpose of determining those who are eligible and ineligible for jury duty. No other rules or regulations are specified. Prospective jurors are excused from jury duty by the jury commissioner or his assistants among other things for hardship, children without supervision, lack of understanding, lack of schooling, inability to write, disastrous financial hardship. Some are excused before making out the "Data of Prospective Jurors" on legal grounds. None of those who have the legal qualifications as jurors are excused except by affidavit, which excuse they must request and then they are only excused for cause. Every prospective trial juror for the panel must fill out the "Data of Prospective Jurors" form before he will be placed on the panel list submitted to the judge. Before the list of 3,500 names was adopted it was presented to the judges for their signatures and it requires a majority of the judges' signatures before it is adopted as the jury list. The judges are furnished only the names and addresses unless they request further information on individuals on the list. The criminal and civil trial jury lists are obtained from the latter list by drawing names from a jury wheel by the sheriff. All of the names are placed on a sheet and when a venire is needed for a particular case names are drawn by chance from the wheel. The majority of the panel in the instant case were women. The reason for this is primarily an economic one because of low jury fees which would work an undue hardship on families if a man supporting a family is taken from his occupation. An affidavit to that effect is accepted as an excuse. No effort is made to get any particular group of men who are reportedly financially able to serve. The information obtained from interview of prospective jurors is confidential. The jury panel for criminal trials in the superior court comes in at different times, January, February and March. The names are drawn out of the jury wheel in the master calendar department in open court by the clerk of that court; a list of them is then made which is sent to the sheriff who summons them. Usually about 120 are summoned at a time. These persons then appear before the judge of the master calendar where they present any reasons they may have for being excused from jury duty. The balance of the names of those not excused are then turned over to the jury clerk. Along in January 1948 (the year with which we are here concerned) the percentage excused of those summoned

before the judge of the master calendar was about 50 per cent. In March it ran a little over that. Of the three groups of 120 drawn at the time the instant case was reached there were 199 on the list. Of the panel compiled in January, February and March there were 142 women and 57 men. Defendants' Exhibit ''D'' contains the document of the jury commissioner's office pertaining to the selection of Mrs. Gehl, juror No. 1 in instant case. The jurors for the case at bar were drawn in Department 37 by the clerk of that court. On March 24th 30 jurors were sent to the trial department along with their names in an envelope; the names were dropped in the jury box and drawn by chance from that box. When these jurors' names were exhausted 29 more were sent over and handled in the same manner; upon exhausting these names 30 more were sent over.

▪ Appellants contend that it is incredible and unreasonable that after examination of a list of some 35,000 names summoned by the jury commissioner only 3,500 names were placed on the jury panel for submission to the judges of the court. In a county the size of Los Angeles County it does not appear to us unusual or unreasonable that a large number of prospective jurors might be excused under the provisions of Code of Civil Procedure sections 198, 199, 200 and 201, as well as in the discretion of the jury commissioner, pursuant to the terms of section 204c of the same code. Furthermore, the actions of a jury commissioner in selecting and making up a jury list are presumed to be valid, and in the absence of some showing of abuse of discretion by him his actions will not be disturbed. No such showing is made herein.

▪ In the selection of names to compose the jury list the jury commissioner is invested with full power to decide as to who are qualified to serve and who are entitled to be excused. Unless such selection is fraudulently made, or made in such a manner as to deprive an accused of a fair and impartial trial, the jury commissioner's actions will not be invalidated.

▪ As a general rule, errors and irregularities in failing to comply strictly with the statutes in making up a jury list, when there is no resultant prejudice to the parties involved in litigation, does not invalidate the list (*People* v. *Parman*, 14 Cal.2d 17, 19 [92 P.2d 387]; *People* v. *Tennant*, 32 Cal. App.2d 1, 8 [88 P.2d 937]; *People* v. *Crossan*, 87 Cal.App. 5, 10 [261 P. 531]). A defendant cannot complain if he is tried by an impartial jury and can demand nothing more.

Appellants' contention that the selection of the jury panel

entirely from the register of voters was improper because thereby nonvoters were excluded and such selection did not provide a cross-section of the community, and was prejudicial to them is clearly untenable. If recourse were had to the membership of clubs, lodges, fraternities, etc., as urged by appellants, it appears reasonably certain that a vast majority of such selections would be men and women who are registered voters. The register of voters therefore, presents a reasonable medium for carrying out the provisions of Code of Civil Procedure section 204. A selection of names from the telephone directory, city directory and the register of voters has been held legal and proper (*United States* v. *Local No. 36*, (D.C.Cal.) 70 F.Supp. 782, 798; *State* v. *Perkins*, 211 La. 993 [31 So.2d 188, 192]; Vol. 15 No. 3, p. 55 Los Angeles Bar Association Bulletin).

Appellants complain that in the instant case, when the jury was selected it was composed of eleven women and but one man. This may have resulted from factors other than the elimination of prospective jurors by the jury commissioner. It may have been the result of the drawing of names by the clerk from the jury box, excuses or elimination of veniremen by the court in its discretion, challenges for cause on the part of both the prosecution and defense, or the exercise of peremptory challenges by them. No prejudice to appellants may be inferred because the jury consisted of eleven women and one man (*People* v. *Coleman*, 20 Cal.2d 399, 401 [126 P.2d 349]; *Wong Yin* v. *United States*, 118 F.2d 667).

 There is nothing in the state or federal Constitutions, or in any statute, which guarantees to an accused a trial by a jury composed of men and women, or of only men, or of only women, or of any definite proportion of either sex (*People* v. *Parman, supra*, p. 20). There is no showing whatever in the case at bar that in selecting the jury list the jury commissioner excluded any eligible class or group in the community in disregard of the prescribed standards of jury selections. There was no departure from the statutory scheme. The jury panel here in question was drawn from qualified voters, both men and women of all races, creeds, types of employment and conditions of wealth.

 Appellants next assert that the court erred in not sustaining the demurrer to the second amended indictment contending that it attempted to charge a series of "multiple little conspiracies and to join them together in one major conspiracy." This claim upon the part of appellants cannot

be sustained. The fact is that the allegations of the indictment allege the object of the conspiracy to be the commission of several separate and distinct crimes and that does not change or alter the fact that the crime of conspiracy is the only offense charged in the indictment. Proof of conspiracy to commit any one of the offenses would be sufficient. The case of *Kotteakos* v. *United States,* 328 U.S. 750 [66 S.Ct. 1239, 90 L.Ed. 1557], does not aid appellants. It is easily distinguishable from the case at bar in that in the cited case each of the offenses charged against the defendants were separate and independent of each other, and there was no joint concert of action. It was not, as in the instant case, a single enterprise with an interest common to all defendants. In the Kotteakos case the proof admittedly made out a case, not of a single conspiracy, but of several. ▮ Nothing is indicated in sections 182 or 184 of the Penal Code to the effect that a charge of criminal conspiracy must be limited to an agreement to commit but one crime (*People* v. *Gilbert,* 26 Cal.App.2d 1, 6, 7 [78 P.2d 770] ; *People* v. *Yant,* 26 Cal.App. 2d 725, 729, 730 [80 P.2d 506]). ▮ The offense of conspiracy is sufficiently stated in the second amended indictment under the laws of this state.

▮ Appellants complain that the second amended indictment does not conform to the provisions of subdivision 2, section 950 of the Penal Code in that it does not contain a statement of the acts constituting the offense in ordinary and concise language, or in such manner as to enable a person of common understanding to know what is intended. It is argued that the pleading does not specify who the officers are who were ''caused to misappropriate money and that their official capacity is not disclosed to show they had such public moneys in their custody or under their control in their official positions.''

An examination of the indictment in the light of sections 950 and 504 of the Penal Code discloses that the allegations were sufficient to inform the accused of the charges they would be required to meet at the trial. The second amended indictment was framed substantially in the words of section 504 of the Penal Code. Appellants were thereby informed of the offenses with which they were charged. The particular circumstances thereof were furnished them by the transcript of the testimony upon which the indictment was founded, and which transcript was furnished them pursuant to section 925

of the Penal Code. Under our simplified forms of criminal pleading, the second amended indictment was not wanting in any of the essentials of a valid accusation (*People* v. *Yant, supra*, p. 730; *People* v. *Gordon*, 71 Cal.App.2d 606, 610 [163 P.2d 110]).

Appellants earnestly urge that the verdicts finding them guilty are contrary to the law and the evidence in that there is no evidence of conspiracy to embezzle public moneys. It is argued that embezzlement requires that property must be appropriated by a person to whom it has been intrusted. To constitute embezzlement it is not necessary to show actual possession of the money or the property. It is sufficient to show that while an accused was not in actual possession of the money it was under his control in the sense that it was under his direction and management (*People* v. *Knott*, 15 Cal.2d 628, 631 [104 P.2d 33]). In the case just cited, a county auditor fraudulently issued certain warrants payable by the county treasurer in satisfaction of alleged interest coupons on highway bonds. Although the auditor did not have possession of the funds, her authority to issue warrants on the county treasurer was held to be such a limited control as to support the charge. In the instant case, we are satisfied that such a limited control in appellants Hess and Rose was shown when it was established that before the state warrant could be delivered to the vendors of the property purchased by the state, they were required to bear the approval and "O.K." of such appellants. Also, the allotment appraisals of the lots in question were prepared by the aforesaid appellants and were recommended for approval by them to their superior officers, the latter of whom added their approval without individual check or inquiry, and because of their faith and confidence in appellants Hess and Rose. While it is true that appellant Wheeler was neither an officer nor an employee of the State of California, there was evidence that he acted in concert with appellants Hess and Rose who were officers or employees of the state, and for that reason appellant Wheeler is chargeable as a conspirator with the latter two. A person not a state official may be guilty of the crime of embezzling public funds defined in section 504 of the Penal Code where he is shown to have aided and abetted an official in the criminal act (*People* v. *Little*, 41 Cal.App.2d 797, 805 [107 P.2d 634, 108 P.2d 63]; *People* v. *Fronk*, 82 Cal.App. 465, 469 [255 P. 777]).

Appellants urge that upon delivery of the state war-

rant to the vendor of the property title passed to the latter and the money thereafter could not be the subject of embezzlement by state officials or employees. The answer to this is that when appellant Wheeler obtained authorization to sell the properties for the various vendors the latter agreed to pay him 5 per cent of the proceeds of the sale. Manifestly, the vendors did not intend to keep such 5 per cent paid to them, but to pay it to appellant Wheeler. The evidence establishes a compelling inference that appellant Wheeler had entered into an understanding with the state agents, appellants Hess and Rose, to pay them some 40 per cent of the commissions he received. The amount of these commissions remained at all times the property of the state and were such when they reached the hands of appellants. When such money was appropriated to their own use and purpose, the act came squarely within the language of section 504 of the Penal Code (*People* v. *Langdon,* 1 Cal.App.2d 287, 291 [36 P.2d 424]). Every crucial act from the appraisement of the properties to the transfer of title and payment by the State Controller was lodged with appellants Hess and Rose as agents of the state.

We have heretofore narrated the testimony concerning the various transactions upon which the verdicts of the jury are predicated, and shall not here repeat them. Suffice it to say that appellants Hess and Rose, in their capacity as state right-of-way agents, knew these properties must be acquired by the state to build a highway long before they were acquired. They appraised the properties, but did not, as they were required to do, approach the owners in an effort to obtain the properties for the state at their actual appraised value. Instead they worked in conjunction and by agreement with appellant Wheeler. The inference is reasonable that their appraisals were influenced by the knowledge that appellant Wheeler would receive a profit by way of commissions in which they were to share in the amount of 40 per cent or, as in the Hiam-Spohr transactions, to enable appellant Wheeler to purchase the property through ''dummies'' and sell to the state at a substantial profit in which appellants Hess and Rose shared to the amount of 60 per cent. Under these and all the other facts and circumstances here present, to say that the evidence is insufficient to establish a violation of section 504 of the Penal Code would exalt form and ignore substance. The jury was also authorized to take into consideration the fact that none of the appellants testified at the trial to deny or explain

any of the evidence, facts, or circumstances aforesaid (Cal. Const., art. I, § 13; Pen. Code, § 1323). In the transactions wherein appellant Wheeler acted as the broker, the vendors set the net value of their properties and told him that the commission must be obtained from the buyers. It was reasonable therefore, that the jury could infer that the money received by the vendors minus the commission or profit was the market value of the property, and that had appellants Hess and Rose directly approached the sellers, the property could have been obtained for the state at amounts less than such amounts plus the commission. Title to the excess amount never passed to the vendors. They simply collected it for appellant Wheeler and acted as a convenient conduit for that purpose. The evidence was sufficient to support the guilty verdicts as to Count I of the second amended indictment.

We come now to a consideration of appellants' contention that the court erred in its rulings upon the admission and exclusion of evidence. ■ There was no error in permitting evidence of the practices and customs of the State Highway Division (*People* v. *Silver*, 87 Cal.App.2d 337, 347 [197 P.2d 90]). Although appellant Wheeler was not connected with the State Highway Division, such testimony was binding upon him once it was established that he was a member of the conspiracy. ■ Common design is the essence of conspiracy, and the crime may be committed whether or not the parties comprehend its entire scope, whether they act separately or together, by the same or different means, known or unknown to some of them, but constantly leading to the same unlawful result. As a coconspirator, appellant Wheeler was bound by the testimony.

■ Equally without merit is appellants' claim that it was prejudicially erroneous to permit Supervising Right-of-Way Agent E. F. Wagner, to testify that it was a practice to buy below the appraised value of the property. This witness spoke from a wealth of actual experience and neither appellants Hess or Rose denied the truth of such testimony, although they were employed in the Division of Highways, and it must be assumed, knew the rules, practices and customs prevailing therein. For the reasons above stated, the testimony was binding upon their coconspirator Wheeler. ■ The provisions of article I, section 14 of the Constitution of California are not pertinent to a consideration of the court's ruling.

■ There was no error in the rulings upon the admission

of documentary evidence of customs and practices prevailing in the office of the Division of Highways, and for the reasons stated above such testimony was binding upon appellant Wheeler as a member of an established conspiracy. If the prevailing customs and practices could have been established by the oral testimony of a qualified witness (*People* v. *Silver, supra,* p. 347) certainly there can be no valid objection to documentary evidence establishing the existence of such customs. The testimony was offered to show that in initialing certain documents appellants Hess and Rose were conforming to established highway division customs and practices.

Appellants earnestly urge that the court erred in refusing to strike from the record evidence relating to all counts of the amended indictment, save and except Counts I and XX which alone went to the jury.

 As the close of the prosecution's case, appellants moved the court to strike from the evidence Exhibits 1 to 30, inclusive, which were contained in the Auer transaction (Counts XX and XXI). This motion was predicated on the fact that the Auer counts had been dismissed by the court. It was not error to deny the motion. Even though the substantive offenses alleged in Counts XX and XXI (the Auer transaction) were dismissed by the trial court, evidence received in support thereof was not necessarily inadmissible as to the conspiracy count upon which the appellants were found guilty. The purpose of evidence in a conspiracy case is to establish an illicit concord of the participants therein, and the challenged evidence was admissible to show that the appellants entertained a mutual design to commit the offense designated as the aim and objective of the conspirators, followed by an overt act or acts in pursuance to such design. It is of no consequence whether this evidence made out the substantive charges contained in the Auer transaction counts if it was material to and competent in relation to the separate charge of conspiracy.

 There was no error in the ruling by which the district attorney was permitted to ask a witness who was one of the property owners, "if Mr. Rose and Mr. Hess (state right-of-way agents and appellants herein) had contacted you with reference to the sale of the three lots to the State of California prior to November 19, 1943, which is the day you and your brother signed the selling authorization to Mr. Wheeler (appellant herein), would you have sold those three lots directly

to the State of California?'' The state of mind of the vendor at the time of the transaction in question was material and relevant to the issues involved and was not, as appellants claim, a conclusion upon his part (*Macart* v. *San Joaquin B. & L. Assn.*, 45 Cal.App.2d 395, 400 [114 P.2d 395]; *Whitlow* v. *Durst*, 20 Cal.2d 523, 525 [127 P.2d 530]; *Bridge* v. *Ruggles*, 202 Cal. 326, 330 [260 P. 553]; *Katz* v. *Enos*, 68 Cal.App.2d 266, 275 [156 P.2d 461]). The evidence discloses that the state wanted the property and was out to purchase it for freeway purposes, all of which appellant Wheeler knew and did not disclose to the vendors when he procured a sales authorization. No effort was required on his part to sell the property, and it was material to show that the vendor would have readily sold to the state as he could have done had appellants Hess and Rose contacted him directly, as it was their duty to do.

Appellants' contention that the court erred in refusing to strike out all evidence and exhibits relating to the counts dismissed cannot be sustained. As heretofore pointed out, the real question involved is whether such evidence is relevant. Evidence is relevant when no matter how weak it may be it tends to prove the issue before the jury. The existence of a conspiracy was a question of fact as was the question of appellants' participation therein, and any evidence, whether it was insufficient to prove the substantive charges contained in the dismissed counts or not, was admissible if it had a tendency to illustrate or throw any light on the separate conspiracy charge, leaving the strength of such tendency or the weight of such evidence to be determined by the jury. The relevancy of evidence that may be offered upon an issue of fact depends upon the nature of the issue to sustain which or against which it is offered, and a wide discretion is left to the trial judge in determining whether it is admissible or not. We perceive no prejudicial error in the rulings of the trial judge in the admission of the evidence herein challenged by appellants. Evidence of an overt act is admissible even though innocent except for its relation to the illicit agreement.

No prejudicial error was involved in the court's ruling admitting into evidence a letter from G. B. McCoy, chief right-of-way agent at Sacramento to the district engineer at Los Angeles, calling attention to the fact that ''it is the strict policy of the division of highways that our right of way negotiating personnel shall under no circumstances deliver maps

or appraisal information to real estate brokers, attorneys or other individuals for the purpose of permitting these people to attempt to negotiate a settlement with property owners at a price less than our appraised value and make a profit at the expense of the property owner or possibly at the expense of the state.'' The letter was initialed by both appellants Hess and Rose in their handwriting, thereby indicating that they read it. The evidence being sufficient to establish a conspiracy and that appellant Wheeler was a member thereof and participated therein, the letter was binding upon him. Indeed, the evidence fully warrants the inference that appellants Hess and Rose gave appellant Wheeler all information including their appraisals, and shortly after the appraisals were made, appellant Wheeler approached the property owners and secured selling authorizations from them for less than the appraisal price, of which the owners had no knowledge, and the commissions were added to that price.

 Appellants' next ground for a reversal is that their acquittal on the charge contained in Count XXII of the second amended indictment amounted to an acquittal on Count I, the conspiracy charge.

Count XXII charged the embezzlement of $912.50 of public money. This amount was made up of $412.50 in real estate commissions paid in the Hiam-Spohr transaction (Counts XXII and XXIII), and $500 which appellant Wheeler received as profits from the sale of the property. Upon the conclusion of the prosecution's case and, when the court held that the real estate commission did not constitute embezzlement of public funds, the district attorney amended the indictment to make the $912.50 read $500. Appellants urge that their acquittal of the embezzlement of the $500 charged as a substantive offense in Count XXII constituted an acquittal under Count I, the conspiracy charge. None of the overt acts alleged in support of the conspiracy charge were dismissed by the court. The fallacy of appellants' argument is apparent when it is remembered that the proof necessary in the conspiracy is the establishment of an illicit agreement, and that the overt acts in support thereof may be considered, not necessarily in the light that they involved completed substantive offenses, but that they were steps in proof of the claimed agreement to embezzle funds of the state. Whether or not the aforesaid $500 profit amounted to an embezzlement, evidence thereof was admissible under the separate and distinct charge of conspir-

acy, as part of the alleged scheme or plan set forth in the conspiracy count. Before the plea of res adjudicata urged by appellants can be sustained, the prosecution must have been for the same offense. The substantive crime of embezzlement and the crime of conspiracy are separate and distinct offenses. The trial under Count XXII was for embezzlement and under Count I was for conspiracy, both relating to the same alleged unlawful transaction, it is true, but separate and distinct offenses nonetheless (*Woodman* v. *United States,* 30 F.2d 482; *Fall* v. *United States,* 49 F.2d 506, 511; *United States* v. *De Angelo,* 138 F.2d 466, 469). In *People* v. *MacMullen,* 218 Cal. 655, 656 [24 P.2d 793], it was held that the dismissal of a charge of conspiracy to commit grand theft after empanelment of the jury, although it may in legal effect, amount to acquittal of the charge of conspiracy, is not a bar to subsequent prosecution for the crime of grand theft, although the crime is alleged in the conspiracy indictment as the sole overt act committed in furtherance of it. (See, also, *People* v. *Chait,* 69 Cal.App.2d 503, 513 [159 P.2d 445] ; *People* v. *Benenato,* 77 Cal.App.2d 350 [175 P.2d 296] ; *People* v. *Dukes,* 2 Cal.App.2d 698 [38 P.2d 805]). The cases of *People* v. *Koehn,* 207 Cal. 605 [279 P. 646], and *People* v. *Werner,* 29 Cal.App.2d 126 [84 P.2d 168], cited by appellants, are readily distinguishable from the facts with which we are herein confronted.

 Appellants' contention that the statute of limitations had run out on the conspiracy charge (Count I) is unavailing. The indictment in the case at bar·was filed September 25, 1947. Overt acts were alleged in the conspiracy count which were assertedly committed as late as March 5, 1947, or less than six months prior to the filing of the indictment. While the authorities are in conflict as to when the statute of limitations operates as a bar to prosecutions for conspiracy, the majority favor the view that although the conspiracy was formed prior to the statutory period of limitations, the prosecution is not barred where an overt act in furtherance of the conspiracy was committed within that period. The California view apparently is that a conspiracy is a continuing offense (*People* v. *Ware,* 67 Cal.App. 81, 84, 85 [226 P. 956]). Therefore, the statute of limitations had not run.

 Appellants' next complaint is addressed to the action of the court in discharging a juror (Mrs. Waters) after the jurors had been deliberating some two days. In connection

with such discharge of the juror, the following occurred after the return of the jury to the courtroom:

"THE COURT: I was advised that Mrs. Walters' father had a stroke, and of course nobody knows what his condition will be. Mrs. Waters, what do you wish to do? I have the authority to excuse you if you request it.

"JUROR WATERS: I would like to be.

"THE COURT: I can excuse you only on your own request. That is why I brought you over. Do you make that request?

"JUROR WATERS: Yes.

"THE COURT: Under Section 1089 of the Penal Code I have the authority. If there is any legal objection——

"MR. BRANDLER: No objection, your Honor. The People are willing to stipulate that by reason of the illness of Mrs. Waters' father she may be excused.

"MR. PARSONS: May we approach the bench?

"THE COURT: There is not a thing in the world that I can conceive of that would be helpful in approaching the bench. If counsel do not care to stipulate I will take the responsibility of excusing her.

"MR. PARSONS: We are willing to do anything we can in a situation like this, but we wonder what we might be doing with respect to the rights of the defendants, that is all.

"THE COURT: Rather than prolong the matter and have any discussion, I do excuse Mrs. Waters.

"MR. LAVINE: May I voice my objection?

"THE COURT: Yes, if you have any legal objection.

"MR. LAVINE: That is it."

Following some further discussion the court excused Mrs. Waters without the consent of appellants and directed the clerk to draw the name of one of the alternate jurors, who thereupon replaced Mrs. Waters in the jury box.

Appellants' first claim is that excusing the juror under the circumstances here present constituted jeopardy and therefore, an acquittal of appellants. Relying heavily upon the case of *People* v. *Young*, 100 Cal.App. 18 [279 P. 824], appellants earnestly urge that they were once in jeopardy and because a juror was excused without their consent, they are not subject to further prosecution and, in effect, have been acquitted. The case last cited is readily distinguishable from the situation presented in the instant matter. In that case a peremp-

tory challenge was allowed after the entire jury—regulars and alternates—had been empaneled and sworn. Under the provisions of section 1068 of the Penal Code the challenge cannot be exercised after the jury is completed and sworn even with leave of court. Another ground of distinction is that in the Young case the place of the challenged juror was not filled by one of the alternates as in the instant case, but by a juror' called from the venire. Thereby, the unity of the jury composed of twelve regulars and two alternates already accepted by both sides (upon whose empanelment jeopardy had attached) was destroyed by the calling in of a new juror.

It is definitely held in the cases of *People* v. *Howard,* 211 Cal. 322, 325 [295 P. 333, 71 A.L.R. 1385], and *People* v. *Peete,* 54 Cal.App. 333, 363, 364 [202 P. 51], that a verdict of 12 jurors, one of whom was originally an alternate juror, is the verdict of the jury originally sworn to try the case. When the substitution of the alternate juror for one of the regular jurors is in accordance with the provisions of Penal Code, section 1089, no question of double jeopardy would arise. Such procedure does not destroy the unity of the jury because the jury is not complete until the alternate is accepted and sworn. At all times, the alternate is a potential member of the regular jury. Furthermore, no claim is made that the alternate juror seated was not in fact a fair and impartial person to act as a juror. We may assume therefore, that the appellants were satisfied that the alternate juror selected would give them the fair and impartial trial to which they were entitled, should he be called in lieu of any of the regular jurors. The same proceedings were had in the selection of the alternate juror as in the case of the first twelve who took their places in the box. Under the circumstances here present it must be held that appellants have been but once in jeopardy (*People* v. *Burns,* 84 Cal.App.2d 18, 24 [189 P.2d 868]).

■ Appellants further contend that prejudicial error was committed in dismissing Juror Waters, as they assert, "after a mere perfunctory statement by the court and without any legal showing as to the condition of the juror's father."

At the time of the trial of this action Penal Code, section 1089, pertaining to the substitution of alternate for regular jurors, read as follows:

"If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, . . . [so as] to be unable to perform his duty, or if a juror requests

a discharge and good cause appears therefor, the court may order him to be discharged and draw the name of an alternate, who shall then take his place in the jury box, and be subject to the same rules and regulations as though he had been selected as one of the original jurors.''

In the instant case as heretofore pointed out, the court was informed that Juror Waters' father had suffered a paralytic stroke. We find no abuse of discretion in the action of the court advising the juror of the court's receipt of such information and inquiring of her as to whether, under the circumstances, she desired to be excused. Tested in the light of the information which had come to the court at the time it made its decision we cannot conclude that the action taken was, as appellants assert, arbitrary, but that it was a reasonable exercise of the discretion conferred by Penal Code, section 1089. In the absence of any attempt on the part of appellants to inquire into the source of the court's information concerning the illness of the juror's father, we must assume that the court had good cause to believe that her father had suffered a severe heart attack. The action taken was not prejudicial to appellants' rights (*People* v. *Lanigan,* 22 Cal.2d. 569, 577 [140 P.2d 24, 148 A.L.R. 176] ; *People* v. *Van Dadenthal,* 8 Cal.App.2d 404, 410 [48 P.2d 82] ; *People* v. *Burns, supra*).

Appellants direct our attention to numerous cases, all of which are cited in *Jackson* v. *Superior Court,* 10 Cal.2d 350 [74 P.2d 243, 113 A.L.R. 1422], strongly relied upon by appellants. In that case a jury had been empaneled and sworn to try the cause when, over the objection of and without the consent of the accused, the court discharged the jury. The sole question involved was whether jeopardy attached. The case bears no parallel with the facts confronting us herein and is not therefore helpful. In the case at bar, as heretofore pointed out, the question of double jeopardy is not present, and the court exercised its discretion in conformity with the authority conferred upon it by law.

▮ Appellants next assert error in the giving and refusing of certain instructions. It was not error for the court to refuse to instruct the jury on ''the status of the money in escrow.'' ▮ The escrow holder simply acts as a depositary and is the agent of both parties until the terms of the escrow are completed. ▮ The escrow holder obtains no title to the fund deposited in escrow. ▮ The deposit of moneys in the escrow does not alter or change the ownership thereof. ▮ If the money here in question was the prop-

erty of the state when deposited in escrow, its legal status was not changed by such deposit. To instruct the jury as to the status of money in escrow would serve only to confuse them, and complicate the issues presented to them. It is true, as pointed out by appellants, that some time after the jury retired to deliberate, they returned into court and through the foreman asked, ''Some of the jurors want to know—the money paid into the Hiam-Spohr escrow, the state paid the money into escrow, but whose money was it while it was being held in escrow?'', to which the court responded, ''The state paid the money not into the Hiam-Spohr escrow but into the Spohr-State escrow.'' Thereupon, the judge informed the jury that it was his impression he had ''covered that with an instruction. I don't have the instructions now . . . if there is some question about that, why we can pick it up tomorrow morning. I will have in mind the question which the jurors are asking to determine whether or not I will give any additional instruction.'' Beyond the request of one of appellants' counsel that ''We ask your Honor to give the particular instruction'' an examination of the record reflects that nothing further was done in the matter. When court reconvened on the following day no mention was made concerning the jury's request and it must be assumed that the court decided against giving any further instructions on the issue requested. As heretofore pointed out, the failure to give instructions as to ''the status of the money in escrow'' was not prejudicial error.

Neither was prejudicial error committed in advising the jury by way of instruction, that the Director of the Department of Public Works of the State of California was an officer within the meaning of section 504 of the Penal Code; that the Division of Highways is a division of the department of public works under the direction of the director of the department of public works, and that appellants Hess and Rose, as right-of-way agents for the Division of Highways, were clerks and servants of the State of California in the department of public works, within the meaning of Penal Code, section 504 (*People* v. *Knott, supra*; *People* v. *Kirk,* 47 Cal.App.2d 136 [117 P.2d 385]).

There was no error in advising the jury that on the question of control of state money, the procedure requiring the signature of a right-of-way agent on a right-of-way contract, recommending its approval, ''is one step in the procedure for causing the state to pay out public money for the

purchase of real property for highway purposes." That "Therefore, Rose and Hess as right-of-way agents did have a measure of control of state money—and a sufficient control to satisfy the requirement of section 504 of the Penal Code." There was no dispute that appellants Hess and Rose, right-of-way agents, recommended the approval of right-of-way contracts, and that without such approval, no state funds would have been paid out. The question of whether or when the moneys ceased to be state funds was one of fact for the jury to determine under the evidence and instructions of the court. To have advised the jury when such funds ceased to be public funds would have invaded the province of the triers of fact.

The next instruction complained of involved in part the substantive offense charged in Count XXII. Appellants were acquitted on this count. We fail to perceive wherein the jury was misled by the instructions insofar as Count I, upon which appellants were convicted was concerned.

Appellants' complaint as to another instruction in that it allegedly failed to tell the jury that they could not be convicted unless they appropriated money while it was still state money is without merit. In other instructions the jury was definitely so advised.

The court properly refused appellants' requested instruction Number 18, reading in part as follows: "if you find from the evidence in this case that the defendants Rose and Hess had only power to recommend the sale or disposition of state property and did not have the power to dispose of it, such recommendations on their part were not and are not embezzlement of any property so involved within the laws of the State of California."

Appellants Hess and Rose were not engaged in the sale or disposition of state property, but in the purchase of it for state highway purposes. We find nothing in the cases of *People* v. *Warren*, 16 Cal.2d 103, 116 [104 P.2d 1024], or *People* v. *Adams*, 14 Cal.2d 154 [93 P.2d 146], applicable to the facts in the instant case.

The failure to give appellants' proffered instruction 16 that appellant Wheeler, not being an agent or employee of the state, or that in such capacity he ever had possession or control of any state money and therefore, could not be guilty of the offenses charged unless he conspired with or aided and abetted appellants Hess and Rose to embezzle state moneys was proper. The jury was fully and fairly apprised of the kind and quantum of evidence required before appellant

Wheeler could be convicted of conspiracy under Count I, and the proposed instruction was merely repetitious and cumulative.

 It was not error to refuse to give appellants' instruction Number 14 to the effect that ''the policy or practice of a department of the state is not binding upon a defendant unless it is a rule or regulation of the state filed in accordance with the statutes and regulations with the Secretary of State.'' The only reason assigned by appellants in support of their contention that this instruction should have been given is that another official, ''head of the state highway department had engaged in a very similar transaction with the state and had made a profit out of it and he was not being prosecuted.'' Assuming the truth of this statement, it furnishes no ground upon which to predicate an instruction concerning the conduct of those who were on trial. Furthermore, there was evidence that in the operation of the State Highway Division they promulgate their own rules of practice and regulation. Our attention is not directed to any statute requiring the filing of such rules and regulations with the Secretary of State. Furthermore, neither appellants Rose or Hess, who were state agents, took the stand to deny the existence of or their familiarity with such rules and regulations.

 Appellants proposed instruction Number 23 was properly refused because by it appellant Wheeler would not be subject to prosecution for conspiracy under any circumstances in connection with the receipt by him of so-called real estate commissions. The instruction was too broad, expansive, and therefore should not have been given.

 Appellants challenge the correctness of several other instructions given, and assert error in the refusal to give others, but when we remember that instructions should not be considered singly, but in their entirety (*People* v. *Macken*, 32 Cal.App.2d 31, 41, 42 [89 P.2d 173] ; *People* v. *Curtis*, 36 Cal.App.2d 306, 322 [98 P.2d 228]), we are persuaded that when so viewed the instructions given are not subject to the criticisms urged by appellants, and the rejected instructions were properly refused. A review of all the instructions given convinces us that the trial judge fully and fairly advised the jury as to the kind, quality and degree of proof required before appellants could be convicted of the crime of conspiracy charged in Count I of the second amended indictment. This is all that was required.

As a further ground for reversal, appellants urge that they

were denied the equal protection of the laws in that the chief right-of-way agent of the state who allegedly, "had bought property in the path of the freeway, signed his own appraisal and the property was resold to the state at a hiked price" was not prosecuted, but that "petty agents (appellants Rose and Hess) were singled out for prosecution." Appellants offered an instruction that such was their contention and, that if the jury found such to be true, appellants were entitled to an acquittal. For reasons about to be advanced, the instruction was properly refused and the claim of appellants must be rejected. Aside from the fact that there is considerable evidence in the record showing no parallel between the transaction of the chief right-of-way agent with the state and the activities of appellants, the latter sought to inject a false issue into the trial of the instant case, which, as is stated in *People* v. *Darcy,* 59 Cal.App.2d 342, 353 [139 P.2d 118], "if approved could easily lead to a rule that if some guilty persons escape, others who are apprehended should not be prosecuted." ▆▆ It is not a denial of equal protection that one guilty person is prosecuted while others equally guilty are not (*People* v. *Darcy, supra,* p. 353; *People* v. *Oreck,* 74 Cal.App.2d 215, 222 [168 P.2d 186]; *People* v. *Montgomery,* 47 Cal.App. 1, 11 [117 P.2d 437]). The case of *Yick Wo* v. *Hopkins,* 118 U.S. 356 [6 S.Ct. 1064, 30 L.Ed. 220], and other cases by appellants are distinguishable from the case at bar (see *People* v. *Darcy, supra,* pp. 353, 358).

▆▆ Finally, appellants Hess and Rose contend that the provisions of section 1203 of the Penal Code insofar as they restrict the right of a trial judge to grant probation "to any defendant who shall have been convicted of robbery . . . nor to any public official . . . who, in the discharge of the duties of his public office or employment . . . embezzled public money . . .", is unconstitutional.

Appellants urge that the courts of this state derive their powers and jurisdiction from the Constitution of California (art. VI, §§ 1, 5, 6), and that this jurisdiction can neither be restricted nor enlarged by legislative action. ▆▆ The right to enact laws making certain actions criminal and to designate the punishment for such crimes is vested exclusively in the Legislature. ▆▆ Clothed with the power to prescribe penalties for violations of criminal statutes, it necessarily follows that the legislative branch of the government has the power to declare that in certain of these cases, probation may not be granted. ▆▆ The exercise of such power

in no way impinges upon the jurisdiction of the judicial branch of the government. It does not impair, restrict nor enlarge upon the jurisdiction of the courts. ▆▆▆ The function of the courts is to determine the guilt or innocence of an accused. What disposition may thereafter be made by way of penalty is for the Legislature to determine.

▆▆▆ Section 1203 of the Penal Code does not in any way attempt to affect the right of the courts to issue writs or to impair the exercise of their trial or appellate jurisdiction. It is not necessary to extend this opinion further by considering the cases cited by appellants. It is sufficient to say that they do not conflict with the conclusions we have reached.

We have satisfied ourselves that there is no substantial merit in the point presented by appellants Rose and Hess although it has been ingeniously and with as much force as untenable legal problems may be supported pressed upon us in their brief. Section 1203 of the Penal Code insofar as its provisions are herein challenged is constitutional.

Furthermore, it is noteworthy that in denying probation to appellants Rose and Hess in the instant case the court was not influenced by the challenged provisions of Penal Code, section 1203. This is evidenced by the statement of the trial judge at the time probation was denied, wherein he said:

"I am denying probation and I do deny probation to the defendants Hess and Rose in this case, No. 115,518, because it is mandatory that I sentence the defendants to prison in the other case under count 2. If I could grant probation to defendants Hess and Rose so that they would not have to go to San Quentin on any other counts I would feel differently about this. I am making this statement for the record."

In "the other case" referred to by the court, and now on appeal and pending in this court (Criminal No. 4337) appellants Rose and Hess, state employees, were convicted of the substantive offense of embezzlement of public funds. Whether section 1203 of the Penal Code prohibits the granting of probation to governmental employees convicted on a conspiracy charge, such as the one charged herein, becomes immaterial because the denial of probation was manifestly based on the conviction on the substantive charge as contained in a case other than the present one.

A reading of the voluminous transcript in this case, containing 1,988 pages and the briefs, made up of 555 pages, impresses us that the learned trial judge was fair and just to both the prosecution and the defense. Throughout the pro-

tracted trial he was patient and kindly disposed toward all the parties and counsel for both sides. Appellants have been fairly tried and justly convicted of the offense charged against them.

The judgments and the orders denying a new trial as to defendants Hess and Rose are, and each is affirmed. The attempted appeal of defendant Wheeler from the judgment is dismissed, and the order denying his motion for a new trial is affirmed.

Doran, J., and Drapeau, J., concurred.

A petition for a rehearing was denied June 25, 1951, and appellants' petition for a hearing by the Supreme Court was denied July 12, 1951. Carter, J., and Schauer, J., voted for a hearing.