[Crim. No. 2500. First Dist., Div. Two. Sept. 1, 1948.]

THE PEOPLE, Respondent, v. BENJAMIN G. SILVER, Appellant.

Leo Friedman for Appellant.

Fred N. Howser, Attorney General, David K. Lener, Deputy Attorney General, Edmund G. Brown, District Attorney, and Charles Perry, Assistant District Attorney, for Respondent.

GOODELL, J.—On July 14, 1944 an indictment was presented accusing the appellant of soliciting and receiving a $200 bribe for giving out the questions to be asked in an examination for architects' licenses. A motion to set aside the indictment was made and denied, whereupon a plea of not guilty was entered. At the ensuing trial the jury disagreed. Before the second trial opened appellant again moved, before a different judge, to dismiss and set aside the indictment, which motion was granted. The People appealed and this court reversed the order (*People* v. *Silver*, 75 Cal.App.2d 1 [170 P.2d 80]). A petition for hearing by the Supreme Court after

the decision of this court, was denied. At the second trial which then ensued, the jury found the appellant guilty. The present appeal is from the judgment and from the order denying a new trial.

The indictment alleges that the bribe was received in San Francisco on June 16, 1944. The examination was set for June 26, 1944.

Appellant had been with the State Board of Architectural Examiners from 1934 to 1939; he had been in the Army for a period between 1939 and 1943, and in the latter part of 1943 had been reemployed by the board. His position was that of investigator. One Robert Anshen had studied architecture and held two degrees in that subject, but had never been licensed in California. He held a responsible position in a large war-time housing project in Vallejo, and in February, 1944, he and appellant first met. Anshen and one Allen had been associated in business and had designed and built a home in Woodside, about which they had written an article published in a national architectural magazine over the names ''Anshen & Allen, Architects.'' Appellant's first interview with Anshen had to do with this article, as it gave the impression that Anshen was a practicing architect whereas he had not been licensed in California. According to Anshen, after a discussion of that matter (during which Anshen disclaimed having signed the article as ''architect'' and promised to request a correction), appellant dismissed the matter by saying he was only ''kidding.'' According to appellant, however, there was no such amicable disposition of the matter, but it remained an open and active subject committed to his investigation, and he expected Anshen to clear it up. The bearing of this subject—remote as it may seem from the important question of a sale of examination questions—is of importance since appellant claims that when he received the envelope containing $200 in currency he understood it to contain the correspondence which Anshen had promised to send him touching the magazine article, and nothing else.

After the February meeting there was no communication between them until June 14. At the February meeting they had incidentally discussed the June 26 examination, in which Anshen had indicated his interest. In May Anshen filed his application to take it. In the late afternoon of Wednesday, June 14, appellant, en route from Sacramento to San Francisco, called at the project office, and as Anshen was not there, he called at Anshen's home in Vallejo. His visit was unexpected

and unannounced. Anshen, who was at home, invited him in, and they had a few drinks. He was asked to stay to dinner and finally accepted. There is a sharp conflict as to some of the incidents of that visit. Anshen testified that appellant indicated he knew the application had been filed, and questioned why Anshen had communicated with the board instead of with himself. Anshen testified, also, that appellant told him "They have asked me to proctor the examination in Los Angeles, and I don't know whether I will or not, and it would be so much easier for you if you were to take it there" to which Anshen replied that he had arranged to take it in Berkeley. Anshen also testified that appellant told him that he sat with the board during oral examinations and that he volunteered the information that the principal problem of the examination would be the design of a veterans' memorial clubhouse. Also, that appellant suggested that Anshen might look over former examination questions, which was permissible, and that he had those given in 1936, 1939, 1940, 1942 and 1943, which he got from his car and brought in and turned over to Anshen, who inquired whether he could make notes from them and was told, "I am not looking anyway; I am reading the newspaper," or words to that effect. Anshen spent about three quarters of an hour looking over these old questions. These questions, given at prior examinations, were permitted by the board to be seen by candidates. They are *not* the questions upon which this prosecution was based, and which are about to be discussed.

According to Anshen, he saw appellant out to his car where, in the course of the parting conversation, appellant said "Some people say I can be bought and sold, but of course I can't" and added "If you want the examination papers, let me know," to which Anshen replied, "Where will you be?" and appellant responded, "How much are they worth to you?" After further conversation appellant said "Name any figure at all" and Anshen said "$150.00" to which appellant replied, "Oh, come, come. They are worth more than that to you." Anshen then said "Well, you name any figure" and appellant said, "What about $500.00?" to which Anshen assented. All this is flatly denied by appellant, who testified that the visit of June 14, was for the purpose of following up his investigation of the magazine article, as Anshen had not sent, as promised, the correspondence looking to the correction. Appellant admitted that during the evening they discussed the coming examination and that he told Anshen he had been asked to

proctor the Los Angeles examination, but said he had declined, and he denied saying it would be easier for Anshen to take the examination in Los Angeles rather than Berkeley. Appellant admitted, also, that he had brought in the old examination questions and had permitted Anshen to look over them and make notes from them, but said he told him that the board did not permit anyone to copy them. Appellant denied flatly and definitely everything testified to by Anshen as to the parting conversation dealing with claimed negotiations as to price and the solicitation of a bribe.

The next day Anshen telephoned to his attorney, later consulted an architect friend of his, and thereafter got in touch with the attorney general's office where he gave his version of what had occurred. State agents were assigned to the case and Anshen lent his cooperation. At a dinner on June 16, in the grill room of a San Francisco hotel, at which Anshen was the host and appellant the guest, appellant inquired, according to Anshen, where the papers or the examination papers (he did not remember which) should be sent by him and when told that Anshen's mail was opened at his office, appellant said "How about sending it to the General Delivery?" This being discarded, appellant asked if Anshen's wife opened his mail and when he said "no," appellant said, "Well, I might as well send it to your house then" and that was agreed to. "At that point," said Anshen, "I took the blank envelope with the money in it and put it over on his side of the table." The money referred to meant the ten $20 bills which had been supplied by the agents for that purpose, the serial numbers of which had been recorded. Appellant then wrote something on a slip of paper. When they parted after dinner appellant was arrested by the agents and the envelope containing the ten $20 bills was taken from his person. A later search disclosed in his pocket the slip of paper with Anshen's Vallejo home address written thereon by appellant. The understanding, according to Anshen, was that the remaining $300 was to be paid within three months.

The indictment charged that while acting as an investigator for the board appellant received the bribe with the understanding that his action "upon a matter then pending and which might be brought before" him, should be influenced thereby, in that appellant "was required to assist in the handling and assembling of the examination questions and problems chosen" by the board to be asked of applicants for licenses.

In the first appeal (75 Cal.App.2d 1) we held that the indictment stated a public offense and (p. 5) said: "We are satisfied that it will be sufficient to establish defendant's duty not to disclose the questions if the People prove a practice of the State Board of Architectural Examiners not to disclose the examination questions in advance of the examination and that such practice was known by defendant. Such practice being proved the absence of statute or formal rule on the subject would be immaterial. It would be the legal duty of defendant not to violate the established practice known to him . . ."

Appellant claims that there was no evidence establishing any one of the following essential elements of the offense:

" (1) That the examination questions were to be kept secret and that such secrecy was required by either a rule, regulation or custom of the Board,

" (2) that Silver knew of such rule, regulation or custom, and

" (3) that it was part of Silver's duties to keep such questions secret."

This calls for an inquiry into appellant's duties and responsibilities.

The board consists of five members appointed by the governor (Bus. & Prof. Code, § 5510) for four year terms (*Id.*, § 5515) who serve without compensation (*Id.*, § 5516). The board elects its secretary, who holds office for two years (*Id.*, § 5519). The board is required to meet quarterly (*Id.*, § 5522). Section 5525 provides that ". . . The board may employ inspectors, special agents, investigators, and such clerical assistants as it may deem necessary to carry into effect the provisions of this chapter" which provisions include article 4 (*Id.*, §§ 5550-5556) *dealing with examinations and the issuance of certificates.*

Jeanette Dolsberry at the time of the trial was secretary of the board and had held that position for almost 22 years. She testified that she managed the office, expedited the routine work under the board's supervision and direction and *had complete charge of the examinations* and the registering of the questions and typing them; picking the dates for the examinations; *getting proctors to assist in them,* and that *she managed the examinations,* and usually proctored one of them.

She told how examination questions were prepared, being first assembled by an assistant examiner selected by the board,

then submitted through the secretary to the five members, then sent back to the assistant examiner with suggested changes, and finally mimeographed.

The assistant examiner selected for the June examination was a professor of architecture of the University of California and the questions for that examination were considered by the board at its April meeting. The secretary testified that she had had appellant proofread these questions with her *and nobody else did any proofreading.* There were 60 applicants, and about 70 copies were mimeographed by two girl employees.

The examinations were to be held in Berkeley and in Los Angeles. In addition to appellant's statement to Anshen, that he had been asked by Mrs. Dolsberry to proctor the Los Angeles examination, she testified: "Q. Who was to proctor the examination to be given in Los Angeles? A. I had asked Mr. Silver if he could. Q. What reply did he make? A. He said, yes, he would." When asked as to a proctor's functions she said: "There has to be someone in charge, something of a teacher. I call the classes and dismiss them, and generally supervise them; no copying or talking. Everything is run according to regulation."

Mrs. Dolsberry's testimony was sufficient to prove the allegation that appellant "was required to assist in the handling and assembling of the examination questions and problems," for he was the only person who assisted her in proofreading the questions, and her testimony that he had been requested to proctor the Los Angeles examination was proof to the same point, for as such he would have sole responsibility for the handling of the questions at the examination itself. In both tasks *he would be carrying into effect the provisions of the chapter dealing with examinations and the issuance of certificates,*—a duty prescribed by the statute itself (§§ 5525; 5550-5556, *supra*) and not laid down by any mere rule or regulation.

With respect to whether it was the practice of the board to require secrecy respecting the questions to be given, Mrs. Dolsberry was interrogated at some length. It is not necessary to quote all this testimony, but the following is typical:

"Q. Is it your understanding that any person can disclose these examination questions in advance? A. No, it is not my understanding." She admitted that she never had any instructions on the subject; she assumed that secrecy was

called for. In the following colloquy, in which the court took part, she made it clear that *her* practice was *the board's practice,* for she was in charge of the questions and of the examinations themselves.

"Q. Upon what do you base your testimony here they should be kept secret? A. The examination that should be given should be secret . . . My practice was not to disclose any questions.

"The Court: Q. But you don't know what the general practice was in the office? A. Your Honor, I was the only one in —— Q. Answer the question: Do you or do you not know what the practice in the office was? A. My practice was not to disclose them. Q. You don't know anything about the general practice in the office? A. I was working for the board. I had charge of them.

"Q. Answer my question. Is your answer 'Yes' or 'No'?

"A. I don't know how to answer it. You get me so confused, your Honor, I don't know what to say . . . My rule was not to disclose the questions . . . I would say my practice, because I represent the board.

"Q. The board's practice was not to disclose the examinations?

"A. Yes . . ."

On cross-examination appellant's counsel asked her "You just answered in reply to the judge's query that it is the practice of the board that these questions should not be made public. Was any mention made of that?" to which she responded: "As I say, there never was any conversation one way or the other about it. I had charge of it and kept the questions secret."

Her testimony that she "had charge of it and kept the questions secret" was given before appellant took the stand. He had the opportunity then to dispute that she had charge, and that there existed the practice of nondisclosure, but made no attempt to do so. In our earlier opinion (75 Cal.App. 2d 1, 5) we said, "We agree that proof of a practice permitting the disclosure of the questions in advance of the examination would be a defense to the charge." Mrs. Dolsberry's uncontradicted testimony as to her authority and her practice was sufficient basis for a finding by the jury that secrecy was the accepted and prevailing rule. Her testimony is all the more convincing since she was a reluctant witness and had written the district attorney that she felt appellant was being persecuted.

It is argued that the foregoing testimony is but a summary of the secretary's own opinions and conclusions and shows no official *board action*. There is other testimony, however, which goes far beyond her own conception of the duty of secrecy and the practice relative thereto and which reaches all the way into the board's own functioning. Appellant was arrested on June 16, just 10 days before the examination. There is nothing in the record to show that anybody other than the secretary then had possession of any copies of the questions, or that any had been released or were at large, but it does appear that appellant had proofread them. The board's action in changing the entire examination after appellant's arrest indicated that secrecy was the prevailing rule, and it was utterly inconsistent with the idea that the questions could be had or read in advance of the examination. This testimony is as follows: "Q. Mrs. Dolsberry, had you received word of the accusation made against Benjamin Silver prior to the time you received that letter? A. Yes, we had. Q. Had any steps been taken by the State Board of Architectural Examiners with reference to the examination that was to be given on June 26th? A. Yes, we had to prepare another set of questions. Q. Were all of the questions given in the examination that year changed from those which had been proof read by you and the defendant Silver? A. Yes, we made a complete new set . . . Q. After word of this case was received they changed the entire examination, is that correct? A. Yes."

The point need hardly be labored that with a five-man board, at least two of them in the southern part of the state, and at least two in the northern part (§ 5514) and the assistant examiner in Berkeley, it was no small task to completely rewrite the questions for a three or four-day examination in the few days between the 16th and 26th of June. Still this was done and it must have been because of fear of a leak. This could mean but one thing—that the board's established practice was secrecy. To say the very least, it was in itself sufficient basis for a finding that such was the established rule.

This brings us to the question of appellant's knowledge of the practice. He had been around that office for five years, from 1934 to 1939 before the war, and for some months after his return, during all of which time Mrs. Dolsberry had been the active, full-time secretary, as its executive head. That in itself was sufficient basis for a finding of his knowledge of the practice. But, beyond that, his own words and conduct indi-

cate that he knew it. If, as now contended, there was no such rule, *or appellant knew of no such rule,* it is difficult to see why he was so careful to inquire (as Anshen testified) whether mail addressed to Anshen was opened by others. In other words, if the questions were open to preview by any candidate as a matter of *right* why this fear that a third person might see them? The jurors could have asked themselves these questions and could have drawn their own inferences.

Appellant makes a serious attack on the secretary's testimony, and claims that his repeated objections to it should have been sustained. His complaint that "No regulation, resolution or order of the Board, relating to the manner of conducting the examinations, was offered in evidence" is answered by what was said on the first appeal (75 Cal.App.2d 1, 5): ". . . the absence of statute or formal rule on the subject would be immaterial. It would be the legal duty of defendant not to violate the established practice known to him." Secondly, a resolution or order elucidating the obvious by prohibiting a preview of examination questions would be almost as ridiculous as one prohibiting a disclosure of model answers. Appellant's complaint that the only evidence as to the manner of conducting the examinations was given by the secretary, "a civil service employee," and that "No member of the Board . . . was called as a witness," is answered by the fact that this civil service employee, in almost 22 years of continuous, everyday service, conceivably could have handled a score of examinations, while board members come and go every four years and meet as a rule but every three months. Obviously no board member was as well qualified as she to testify as to the continuous practice.

Next, it is claimed that there was no direct competent evidence establishing either a rule or a custom to keep the questions secret but "The matter was left entirely to conjecture." The answer to this is that Mrs. Dolsberry spoke, not from hearsay or common repute, but out of a wealth of actual experience of almost 22 years without a break or interruption either in her service or in the practice about which she testified. Moreover, documentary evidence is not required in such cases, nor is corroboration, for "the testimony of one witness if believed by the jury is sufficient to prove a custom or usage" (*McComb* v. *Atchison T. & S. F. Ry.,* 110 Cal.App. 303, 306 [294 P. 81]). That this happens to be a criminal case makes no difference in the rule of evidence (Pen. Code, § 1102). As we have already pointed out, the secretary's testi-

mony stands uncontradicted. In discussing the rule that one witness is sufficient to prove the existence of a custom or usage Wigmore (Evidence, vol. VII (3d ed.), § 2053) says ''Another [answer] is that, if such a possibility of contradiction is to be feared, it is amply provided for in the liberty of the opponent to produce dissentient witnesses and the fair certainty that he will be prepared to do so.'' In deciding the first appeal we said: ''We agree that proof of a practice permitting the disclosure of the questions in advance of the examination would be a defense to the charge'' and in the same opinion we discussed the necessity for proof of defendant's knowledge of the practice. Despite the suggestive character of these utterances the appellant, who testified at length on other subjects, made no attempt to deny either the practice of nondisclosure or his own knowledge of such practice—the two cardinal points urged on this appeal. He had been with the board for well over five years in what was unquestionably a position of trust and confidence—so much so that he had been asked to proctor the Los Angeles examination— and he surely knew what was the practice with respect to the very questions which he would have to give as proctor. If a preview was permitted, as now contended, he could have so testified, which would have put up to the jury a disputed issue of fact. As it stands, the case went to the jury with no contradiction whatever as to the board's practice.

What has been said answers appellant's contention that the evidence was insufficient to support the verdict on this branch of the case.

██ The appellant contends that ''The court erred in instructing the jury that the law implied that the examination questions were to be kept secret''; that such instruction invaded the province of the jury; that it deprived appellant of a jury trial by withdrawing from the jury's consideration a *controverted* question of fact.

The instruction reads: ''You are instructed that one of the principal functions of the . . . Board . . . is the fair and impartial examination of persons seeking to become licensed as architects . . . The law impliedly imposes a duty on all officers and employees of the . . . Board . . . to maintain the secrecy and integrity of all examination questions to be used in the future in examinations to be held by the Board.''

In the first place as we have seen it did not withdraw a *controverted* question of fact. The secretary's testimony was uncontradicted, unimpeached, and certainly not inherently

improbable. A practice contrary to that to which she testified would have been so "inherently improbable" as to reflect on the intelligence of the board. If, then, our conclusion is correct that her testimony was competent to prove the practice, the case comes within the familiar rule "that the uncontradicted testimony of a witness to a particular fact may not be disregarded, but should be accepted as proof of the fact" (10 Cal.Jur. 1143) recently restated in *Gomez* v. *Cecena*, 15 Cal.2d 363, 366 [101 P.2d 477], as follows: ". . . it has frequently been said that testimony which is not inherently improbable and is not impeached or contradicted by other evidence should be accepted as true by the trier of fact."

Appellant's argument that "Instances many times arise in the conduct of examinations where the very questions are divulged in advance in order that research may be made by one taking the examination" is disposed of by the absence from this record of anything of that kind. The board had given out in advance the "titles of the examinations that would take place the various days" or "the particular branches of architecture that would be examined on during the various days of the examination." Anshen had obtained that information *from the board itself by inquiry*. The board had gone that far, but no further.

On this record the court might well have instructed the jury (following the pattern of *People* v. *Fowler*, 178 Cal. 657 [174 P. 892], a murder case) as follows: "It is not denied that there was an established practice of the Board 'to maintain the secrecy and integrity of all examination questions to be used in the future.' " In upholding such an instruction the court in the Fowler case said (pp. 667, 668) : "There was no controversy or dispute at the trial over these facts [the facts of that case]. The court was authorized to state the testimony, if it was uncontradicted, and declare the law, on any subject involved in the case. (Const. Art. VI, sec. 19)." That being so, it could not have been error to simply tell the jury that "The law impliedly imposes a duty" etc.

There may have been a conflict between this instruction and the one which immediately followed it, which was couched in the language of our former opinion, reading as follows: ". . . it is sufficient for the prosecution to establish that it was the Defendant's duty not to disclose the questions to be given in the architectural examination if the People prove a practice of the . . . Board . . . not to disclose the examination questions in advance of the examination, and

that such practice was known by the Defendant. Such practice being proved, the absence of a statute or formal rule on the subject would be immaterial. It would be the legal duty of the Defendant not to violate the established practice known to him.'' Respondent concedes that such conflict exists. However, the error, if any, in giving these conflicting instructions could not have been prejudicial in this case in view of the fact that the jury could have found only one way as to the existence of the practice. Moreover, the instruction which told the jury that ''The law impliedly imposes a duty'' of secrecy with respect to examination questions told them no more than they must have known from their earliest school experiences. It was a matter of common knowledge.

Appellant contends that it was error to admit in evidence the Personnel Board's designation of duties of architectural investigators because appellant held an ''exempt'' position not within that board's jurisdiction. This document contains the following: ''Definition: Under direction, to do investigating and related work in connection with the prosecution of violators of State laws regulating the practice of architecture; *and to do other work as required.*'' (Emphasis added.) It then enumerates ''Typical Tasks,'' within which examinations are not included. The court was in doubt as to its admissibility, saying ''I can't see . . . why that has anything to do in connection with this particular charge . . .'' Had the appellant's objection been sustained, the prosecution's case would not have suffered in the least. At the same time its admission could not have harmed the defense, for the reason that it went no further than the statute itself which defines an investigator's duties. Section 5525, Business and Professions Code, provides for the appointment of investigators, ''to carry into effect the provisions of this chapter.'' The subject of the chapter is ''Architecture,'' and *article 4 thereof deals with ''Issuance of Certificates'' to practice, after the passing of an examination.* The statutory language ''to carry into effect the provisions of this chapter'' makes an investigator's duties coextensive with everything embraced within the chapter. The Personnel Board's direction that an investigator shall ''do other work as required'' is substantially the same as the statutory requirement, but not quite as definite. The admission of this document, even if erroneous, could not have been prejudicial because of the overriding statutory requirement.

What has been just said answers the contention that the instruction embracing the same subject was erroneous.

Appellant claims that the court erred in its instruction on circumstantial evidence. That instruction concluded as follows: "In cases of circumstantial evidence, in order to justify a conviction, facts should be proved which must not only be entirely consistent with the guilt of the Defendant, but must be inconsistent with any other rational conclusion." Appellant's criticism is addressed only to that language. He complains that "it does not contain the necessary element that 'where circumstantial evidence is relied upon it must be irreconcilable with the theory or hypothesis of innocence in order to furnish a basis for conviction.' " The language as given is approved substantially in *People* v. *Bender*, 27 Cal.2d 164 where, at page 175 [163 P.2d 8], after quoting from 8 California Jurisprudence page 371, the court says: "It cannot be too strongly emphasized that such quoted statement enunciates a most important rule governing the use of circumstantial evidence. *In unequivocal language it should be declared to the jury in every criminal case wherein circumstantial evidence is received.*" (Emphasis added.) That part of the instruction given in the case at bar (quoted above) is *substantially the same as the model* quoted in the Bender case from 8 California Jurisprudence, page 371.

There was no error in refusing defendant's requested instruction No. 19, since the instruction given fully and fairly informed the jury on the subject of circumstantial evidence and, in addition to that, the jury was elsewhere given the usual instructions on presumption of innocence and reasonable doubt.

The judgment and order appealed from are affirmed.

Nourse, P. J., and Griffin, J. pro tem., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 30, 1948.