**Harold MARES, Appellant,**

v.

**STATE of Wyoming, Appellee.**

**No. 4041.**

Supreme Court of Wyoming.

Aug. 25, 1972.

---

Paul B. Godfrey, Cheyenne, for appellant.

Clarence A. Brimmer, Atty. Gen., Richard A. Stacy and Bert T. Ahlstrom, Asst. Attys. Gen., Cheyenne, for appellee.

Before McINTYRE, C. J., and PARKER, McEWAN and GUTHRIE, JJ.

McINTYRE, Chief Justice.

Harold Mares has appealed from a conviction of first degree murder in connection with the deaths of two men, John Marshall and James Bonson.

It is undisputed that three men perpetrated an armed robbery of Spirits Lounge in Cheyenne, Wyoming, shortly after midnight on February 10, 1970. Many customers were in the place of business. The holdup resulted in Marshall and Bonson being killed by the robbers. Also, the bartender, Harry Laughlin, and a customer, Steve Meares, were wounded by being shot. Each of the robbers wore a ski mask and dark clothing. Each was armed with one or more guns.

There was evidence tending to show that one man, identified at the time of trial as Mares, went behind the bar while the other two were positioned in the vicinity of either end of the bar. According to such evidence, the man behind the bar had a pistol in each hand; the second man had a pistol; and the third man had a sawed-off shotgun. The masks worn were described as having large open areas about the mouth and eyes; and the gunman behind the bar, who shot the bartender and Marshall, was described by some of the witnesses as having a "light" or "tender-looking" mouth which was distinctive.

Two attorneys were appointed by the trial court to defend Mares. The record indicates they did an exceedingly thorough and efficient job, advancing every possible defense. Also, it is admitted counsel for defendant received a great deal of aid from the Legal Aid Office in Denver, under the "Reciprocal Act." As stated in appellant's appeal brief, an investigator was made available by the Legal Aid Office in Denver and he was able to provide enormous help in locating witnesses and the like.

Appellant's court-appointed attorney on appeal, who was one of the attorneys who defended at his trial, has presented appellant's appeal in an exceptionally capable manner. It is our opinion that Mares would not have had better representation either at the trial level or on appeal had he had unlimited funds. The mere fact that defendant was found by a jury to be guilty of the charge against him must not be construed as any indication that he had inadequate representation at his trial. Likewise, our finding (as will be more fully explained) that the trial was free from reversible error cannot be construed as an indication of inadequate representation on appeal.

Counsel for appellant suggests there was a great deal of confusion and inconsistency in the testimony of eyewitnesses. In fact, he expresses the belief that the only point upon which all witnesses agreed was that the bar was held up on the night in question. Of course, it is to be expected that eyewitnesses who were present at the time of the crime would have differing versions of what happened and which robber did what. That is not at all unusual.

The undisputed facts are such that every person who participated in the holdup is guilty of first degree murder, regardless of which robber or robbers actually did the killing. Therefore, we will not try to reconcile all the testimony of all the witnesses and we will not attempt to decide whether Mares in fact fired the particular bullets which killed Marshall and Bonson. It is quite clear from the evidence that all three men did a considerable amount of shooting, some of it aimed at particular persons and some of it being merely random shooting. The question which the jury had to decide was whether Mares was one of the three holdup men.

Without delineating at the outset the various points on appeal which are argued on behalf of the appellant, we will take them one at a time and indicate why we say defendant's trial was free from reversible error.

### Suppression of Evidence

It is undisputed in the evidence that Mares, who had been sentenced to a term in the Colorado State Penitentiary, escaped from the custody of Colorado officials and became a suspect in a series of armed robberies in Denver and in the Spirits Lounge robbery in Cheyenne on February 10, 1970. On February 12, 1970 Denver police officers received information he was at the home of Carol Ortega in Denver. They went to the Carol Ortega home with a warrant for Mares' arrest.

According to the testimony of one of the Denver officers, the Ortega home was under surveillance when Mrs. Ortega started to leave in her automobile. She was stopped and was told the officers were looking for Mares. At first she denied he was there. In the meantime, however, other surveillance officers saw Mares walk out the back door, then turn around and go back inside. Mrs. Ortega then agreed to return to her home and to allow the officers to enter and see if Mares was there. The officers found Mares sitting on a bed in a bedroom and arrested him. He was turned over to two officers who were remaining outside.

Knowing others were involved in the robberies which Mares was suspected of, officer Brannan of the Denver police then talked further to Mrs. Ortega. At Mares' trial Brannan testified:

"I told her I would like to search the house. I was looking for not only other men but for guns and shot gun and she said there was no one else in the house and there was no guns in the house as far as she knew. None that she knew of. I told her I was ready to go down and get a warrant for this search and, however, she stated that she would rather I did it right then and there and not have to come back. She didn't want us coming back. She wanted it done then."

Before searching further, Brannan claims he advised Carol Ortega of her right to refuse the search. He testified, however, that she did not want the police returning and wanted it over.

According to Brannan's testimony, he then returned to the bedroom where Mares had been arrested, being covered by another detective. He said he was looking for other men and in so doing looked in the closet by the bed where Mares had been sitting. The closet door was open; he parted clothing in the closet and immediately saw a gun lying in plain view on top of a bag of clothing. The gun was three to five feet from where Mares was sitting when arrested.

Counsel for appellant admits the gun was shown ballistically to have been the gun which fired the slugs subsequently removed

from Harry Laughlin and from the body of John Marshall. Thus, there is no dispute about it being at least one of the murder weapons.

Defense counsel made a timely motion for suppression of the evidence obtained in the Carol Ortega home, including the gun. On appeal it is claimed the trial court erred by not suppressing such evidence. We disagree. The testimony of officer Brannan was sufficient for the court to believe Carol Ortega, owner of the home and the person concerned, voluntarily consented and gave her permission for the search.[1]

Aside from that, however, Mares has no standing to object to the search nor to the seizure of the gun. The case is not controlled, as counsel for appellant seems to think, by Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 695. We are not here concerned with the limits of a search which is merely incident to a lawful arrest. The important consideration is that Mares had no ownership in the home that was searched nor in the gun that was seized.

As recently as June 26, 1972 the United States Supreme Court gave recognition to the principle that an objector must have an interest in connection with the searched premises sufficient to give rise to a reasonable expectation of freedom from governmental intrusion. In Combs v. United States, 408 U.S. 224, 92 S.Ct. 2284, 33 L.Ed. 2d 308, the record was found to be barren of the facts necessary to determine whether petitioner had such an interest. The court therefore remanded that case for further proceedings to determine whether petitioner had an interest in the searched premises sufficient to be protectible.

The record in connection with Mares' trial is complete and shows very clearly that Mares had no ownership or interest in the searched premises. There was no reasonable expectation on his part of freedom from governmental intrusion. In other words, there has been no showing of any rights or interest in Mares which would prevent the consent and permission of Mrs. Ortega from being wholly effective.

The suppression of the product of a Fourth Amendment violation can be successfully urged only by one whose rights are violated by the search—not by one who is aggrieved solely by the production of damaging evidence. Northern v. United States, 9 Cir. (1972), 455 F.2d 427, 430; State v. Nickerson, 13 N.C.App. 125, 185 S.E.2d 326, 327; People v. Hill, 22 Mich. App. 91, 177 N.W.2d 220, 222.

The rule seems well established that a mere guest on the premises of another has no standing under the Fourth Amendment to object to the unlawfulness of a warrantless search where the owner has given his consent thereto. State v. Cromeans, 106 Ariz. 173, 472 P.2d 42, 43; Spencer v. People, 163 Colo. 182, 429 P.2d 266, 269.

It has been held that one who lacks legitimate presence on premises has no standing to object to a search. Palmer v. State, 14 Md.App. 159, 286 A.2d 572, 578 (1972). Mares of course, by reason of his status as an escapee, was not legitimately on the premises of Carol Ortega. Instead of having a reasonable expectation of freedom from governmental intrusion, he had every right to expect that.

Regarding the gun (admitted murder weapon) which was found in the room where Mares was arrested, counsel for

---

1. The existence and voluntariness of a consent is a question of fact to be decided by the trial judge in the light of all attendant circumstances. United States ex rel. Harris v. Hendricks, 3 Cir. (1970), 423 F.2d 1096, 1099–1100; State v. Haggard, (1965), 89 Idaho 217, 404 P.2d 580, 585. Also, voluntariness of consent is not destroyed by informing the consenting party that a search warrant will be sought. United States ex rel. Gockley v. Myers, 3 Cir. (1967), 378 F.2d 398, 399; State v. Yoss (1965), 146 Mont. 508, 409 P.2d 452, 455; and People v. Reyes (1971), Colo., 483 P.2d 1342, 1344.

Mares has repeated many times in his brief and in oral argument that the gun belonged to Bugsie DeHerrera.

The defendant did not testify at his trial. However, Bugsie's brother testified that the gun belonged to Bugsie. Also, officer Brannan agreed in his testimony that Bugsie DeHerrera was owner of the gun found where Mares was arrested. He explained that DeHerrera committed suicide in the Denver county jail while awaiting trial there.

█ There is no dispute in the evidence about the gun in question having been owned by DeHerrera. Thus, Mares has no reason or standing to complain about the gun being seized. He cannot on the one hand complain that the gun as property of his was unlawfully seized and on the other hand disclaim all ownership annd connection with the gun.

The investigation of the Cheyenne police following the Spirits Lounge holdup and killing led them to information that the robbery had possibly been committed by men from Denver who might be staying at 215 Stinson Street in Cheyenne. Mares was named as a suspect. The occupant of the residence at this address was Josie Jaramillo.

The record clearly reflects that when the officers went to 215 Stinson Street Josie Jaramillo freely and voluntarily gave verbal consent for the officers to go into her house and look for Harold Mares and to take anything from the house which belonged to Mares. Later Miss Jaramillo signed a written consent reaffirming her oral consent. The officers found certain (unfired) shotgun shells and one .38 caliber bullet.

The bullet was a different type but the same size as the ones which had been fired into Marshall and Laughlin. An F.B.I. agent testified, at Mares' trial, that the shotgun shells had been ejected from the same gun which ejected spent shells at the Spirits Lounge.

Appellant complains on appeal because the trial judge did not suppress the evidence found at the Jaramillo residence. It is obvious, however, that the police had permission to make the search and that Mares could have no standing to object. It does not appear that he ever lived in Cheyenne or that he was ever at the Jaramillo residence except for brief intervals.

### Change of Venue

Appellant complains because the trial judge granted a change of venue from Laramie County to Albany County instead of to Natrona County as requested by the defendant. The only reason suggested for preferring Natrona County over Albany County is that Albany County is serviced by the same television station and basically the same newspapers which are in Cheyenne.

The reason advanced is not valid because the news media causes stories from Cheyenne to go to all parts of the state. There is no showing of any less publicity about the holdup in Natrona County than there was in Albany County. It is in fact within the judicial knowledge of this court that stories like the one here involved are likely to be publicized as much in Natrona County as in Albany County.

Moreover, the robbery was committed by persons who were at the time unknown. There is no showing of undue prejudice against Mares in Albany County. On the issue of whether Mares was or was not one of the holdup men, there is nothing in the record to indicate he could not have a fair and impartial trial in Albany County.

Counsel for appellant concedes he can find no case squarely in point. We will of course not go looking for one. It may serve a useful purpose, however, to repeat some of the principles we set forth in Moss v. State, Wyo., 492 P.2d 1329, 1331, pertaining to a change of venue.

█ As indicated in that opinion, prejudice against the defendant must be shown which is so great or general as to prevent him from receiving a fair and impartial trial; and it is ordinarily within the discretion of the trial court to decide when a change should be granted. Affidavits of

opinions or conclusions are not in and of themselves sufficient to require a change of venue. Mares has shown nothing more as far as Albany County is concerned. Also, interest and indignation of the people are the natural result of shocking crimes and do not of themselves require a change of venue.

We reject the suggestion that defendant could have received a fairer trial in Natrona County than he did in Albany County and hold the trial court did not abuse its discretion.

### Lucero Testimony

Appellant assigns error in connection with the testifying of William Lucero who was called as a state witness. The exact language of the assignments in that regard is as follows:

"2. The procedure whereby the Court allowed the County Attorney to examine Lucero in the manner which constituted improper impeachment of a State's witness and a violation of the Confrontation Clause.

"3. The erroneous procedure whereby the Court allowed the Jury to believe that Lucero did not testify for the reason that he may have been 'threatened' by the defendant or persons working in concert with the defendant."

The record discloses that Lucero immediately showed himself to be an unwilling and hostile witness for the prosecution. The county attorney thereupon produced a statement with initials on each page and a signature at the end, which the witness admitted to be his. The statement had been given February 20, 1970 in the Denver police station. The examining attorney then went through the statement, reading what seemed to be each question and each

answer. Each time, the witness was asked whether he remembered being asked that question and making that answer. Lucero's response, almost without exception, was either "No, sir" or "I don't remember."

Occasionally counsel for the defendant objected to a question of the county attorney on the ground that the state was impeaching its own witness. This objection was generally overruled. Three times the objection was that the question was leading. That objection was sustained once and overruled twice.

There can be no doubt about the right of a party to interrogate an unwilling or hostile witness by leading questions. See Rule 43(b), W.R.C.P.[2]

There can be no question about the right of the prosecution to prove that a witness produced by it has made, at other times, statements inconsistent with the witness' present testimony. It must be kept in mind, however, before the witness can be impeached by proof of inconsistent statements, the circumstances of the supposed statement sufficient to designate the particular occasion must be mentioned to the witness, and he must be asked whether or not he has made such statements, and, if so, allowed to explain them. See § 1–143, W.S. 1957.[3]

Counsel for appellant enumerates the questions relating to Lucero's testimony as these: (1) Whether "the admission" of the testimony through the written statement was error; (2) whether there was prejudicial error in spite of an instruction to disregard; and (3) whether the confrontation clause of the Sixth Amendment was violated by "the admission" of such statement.

Citing Crago v. State, 28 Wyo. 215, 202 P. 1099 (1922), as authority therefor,

---

**2.** See also State v. Narten, 99 Ariz. 116, 407 P.2d 81, 84; Riley v. Holcomb, 187 Kan. 711, 359 P.2d 849, 852; and Hall v. State, 250 Miss. 253, 165 So.2d 345, 350.

**3.** See also Troublefield v. United States, (1967); 125 U.S.App.D.C. 339, 372 F.2d

912, 916; Hawkins v. B. F. Walker, Inc., Wyo., 426 P.2d 427, 430; State v. Green, 71 Wash.2d 372, 428 P.2d 540, 545; and State v. Walker, 148 Mont. 216, 419 P.2d 300, 304–305.

appellant argues "the admission" of William Lucero's testimony through a prior written statement was error under Wyoming law. The argument entirely overlooks the fact that Lucero's written statement was never offered and never received in evidence. Although the state laid a foundation for the impeachment of Lucero, it developed there was nothing to impeach because Lucero never testified to anything of material substance or anything damaging to the state.

The *Crago* case does not support appellant's claim of error in connection with Lucero. The holding in *Crago* was that it was error for the written statement of the witness to be admitted (202 P. 1104). The opinion points out repeatedly that the only purpose of a written statement in such a situation is to neutralize and counteract the effect of the evidence given by the witness on the stand, so as to make that evidence as near as possible as though it had never been given. Because the witness in the *Crago* case did not remember, the court held there was no evidence detrimental to the state to be neutralized and hence the statement should not have been admitted.

It is of interest to note that the court, in the *Crago* opinion, specifically said whenever contradictory statements are admissible in evidence, the court should instruct the jury that the previous statements made out of court must in no event be regarded as substantive evidence in proving a fact. That of course had not been done in the *Crago* case.

In the Mares trial, however, the court was more specific and did instruct the jury. After the prosecution and defense had put on their cases in chief and the defense had rested, the court instructed the jury in these words:

"Ladies and gentlemen, yesterday one of the witnesses was William Richard Lucero of Denver who you remember was called by the State and could not remember anything and the County Attorney read from a statement questions and answers or asked him about each one of them. You remember that witness? That was permitted for the purpose of the State, permitting the State to impeach its own witness. However, matters were in that statement were admissible properly and the witness Lucero actually did not testify to anything so it was admitted improperly and I am going to state to you only that you—without striking that testimony, the whole testimony of this particular witness and I am going to ask all of you to disregard everything that was done in connection with Lucero and forget it just as if it was never in the case, because it wasn't testimony at all. So if you will keep that in mind and ignore that particular witness."

Thus, the court in effect told the jury the witness Lucero actually did not testify to anything and so it was admitted improperly; and the jury was told to disregard everything in connection with Lucero and forget it as if it was never in the case, because it was not evidence at all.

There seems to be a conflict of authority in connection with the right of the state in a criminal case to impeach a witness called by the state, when the witness answers that he does not remember whether he made a prior statement contrary to his present testimony. We need not decide that question. Therefore, we do not pretend to say whether we would adhere to everything said in the *Crago* opinion on that subject, if we were called upon to decide such question.

We find nothing in the record to indicate the defendant was denied a right of confrontation as far as Lucero is concerned. There is nothing in the *Crago* case nor in any of the other cases cited by appellant to support such a contention.

We should perhaps mention Douglas v. State of Alabama, 380 U.S. 415, 85 S.Ct. 1074, 1077, 13 L.Ed.2d 934, which is cited. In that case a convicted accomplice claimed his privilege against self-incrimination. The court therefore held the prosecution could not introduce a written confession of the accomplice under the guise of refreshing his memory. Of course, in the case we

are dealing with, there is no question of a witness who is claiming a privilege not to testify.

There was no claim of privilege or anything else to prevent the examination of Lucero on behalf of the defendant. It would appear Lucero testified to nothing detrimental to the defendant; and if the defendant actually thought untrue facts had been implied by questions propounded by the county attorney to Lucero, the defendant had an opportunity to correct such. Instead of doing so, when the state finished with Lucero, counsel for the defendant stated, "No questions."

■ It is clear in the record that the defense at no time claimed a denial of confrontation with respect to Lucero, to the trial court. An attorney for the defendant stated, no questions; his attorneys accepted without protest the court's oral instruction to the jury to disregard completely everything connected with Lucero; and defendant took his chances on a favorable verdict without any complaint concerning a lack of confrontation. After the verdict has gone against him, it is too late to raise such an objection. Wright v. State, Wyo., 466 P.2d 1014, 1017; Valerio v. State, Wyo., 429 P.2d 317, 319; Webber v. Farmer, Wyo., 410 P.2d 807, 808–810; Elmer v. State, Wyo., 463 P.2d 14, 19.

With regard to appellant's assertion that the trial court allowed the jury to believe Lucero did not testify because he may have been threatened by the defendant or persons working in concert with the defendant, there is nothing in the record to indicate a probability of such belief on the part of the jury. The fact is, when Lucero was on the stand, he testified affirmatively that he had no such fear—because there was nothing he could testify to.

We have reviewed most carefully and fully all of the record as it pertains to Lucero. We can say without any reservation that we find nothing therein to indicate the defendant was unnecessarily prejudiced, especially with the court's instruction to the jury to disregard the whole matter.

*Jury Instructions*

Appellant suggests, without the citation of authority, that the trial court erred by not giving certain instructions requested by defendant and by giving Instruction 7 and Instruction 12.

The language objected to in Instruction 7 is the following:

"It is not necessary that other facts or circumstances surrounding such testimony as has been given on behalf of the State should be established beyond a reasonable doubt. Some of the facts or circumstances may be established by a preponderance of the evidence or may not be established. It is not meant that it is incumbent upon the prosecution to prove every fact surrounding such testimony as given, beyond a reasonable doubt. All that is incumbent on the prosecution is that all the facts and circumstances taken together should establish the defendant's guilt beyond a reasonable doubt. If you are satisfied beyond a reasonable doubt from all the evidence in the case of the defendant's guilt, you should find him guilty."

Instruction 12 recites:

"The test of the sufficiency of circumstantial evidence in a criminal case is whether the circumstances, as proven, are capable of explanation upon any reasonable hypothesis consistent with the Defendant's innocence, and, if they are capable of such explanation, then the Defendant should be acquitted."

■ Appellant's only objection to Instruction 7 seems to be that it dilutes the reasonable doubt requirement. We think not. It clearly instructs that all the facts and circumstances taken together must establish the defendant's guilt beyond a reasonable doubt. That does not mean all facts or circumstances surrounding all testimony offered by the state has to be true beyond a reasonable doubt. The instruction so states.

■ Instruction 12 seems to be wholly for the benefit of defendant. We do not

think it confuses the jury as appellant claims. Some courts have held it error for a court to omit an instruction such as this in any case which rests wholly or partially on circumstantial evidence.[4]

The instructions which appellant claims were erroneously refused dealt with circumstantial evidence and the presumption of innocence. It is of course not error for the trial court to refuse a requested instruction, even if it states a correct principle applicable to the case, when the subject has been covered properly and sufficiently by other instructions.[5] In our opinion, the subjects of circumstantial evidence and presumption of innocence were covered properly and sufficiently by other instructions which were given.

As stated in appellant's brief, counsel for the defendant readily admits he has been unable to find any case law to support his position with respect to jury instructions. In view of this, we believe we have said sufficient and need not belabor the matter further.

### *Judgment of Acquittal*

The last assignment of error asserted by appellant is the failure of the court to grant judgment of acquittal in favor of defendant. The entire argument advanced for this assignment is contained in these words:

> "This point, of course, incorporates all of the previously discussed points. It is respectfully submitted to the Court that the Trial Court should have granted a Judgment of Acquittal in light of all of the points of law set forth herein."

Inasmuch as we have dealt with all of the "previously discussed points" in appellant's appeal without finding cause for reversal, it is apparent we need not consider this last assignment. We do wish nevertheless to mention briefly a few bits of evidence which have not been mentioned heretofore and which point to the guilt of Mares.

Mrs. John Marshall, widow of decedent Marshall, picked Mares out of a lineup in Denver and commented "Only one resembled him at all." At the trial Mrs. Marshall testified she recognized Mares because of his unusual lips and the area around his mouth, which she stated to be identical to the mouth she had seen on the gunman behind the bar during the holdup.

There was testimony that Mares had had facial surgery not long before the time of the Spirits Lounge holdup. Police officers testified that there was something different and distinctive about his mouth.

A witness, Sandy Gregario, testified she was living with Josie Jaramillo at the time of the robbery; and that she saw Harold Mares at this house on the day before the holdup, with two other men. The witness related that the three left the house about midnight; and that one of the men had the shotgun underneath his coat. The next time she saw Mares was the next morning in the front room of the house. He was putting clothes and the shotgun in a suitcase. According to the witness, Mares was nervous and said he had to leave.

Other damaging evidence offered by Sandy Gregario included her statement that she saw ski masks in the house. At the trial she verified that a ski mask found at Spirits Lounge following the holdup looked exactly like the ones she saw at the Josie Jaramillo home.

We find no reversible error in connection with any of the assignments of error which have been urged on behalf of the appellant.

Affirmed.

4. See State v. Riley, 12 Ariz.App. 336, 470 P.2d 484, 485; State v. Stowers, 2 Wash.App. 868, 471 P.2d 115, 116–117; People v. Silver, 87 Cal.App.2d 337, 197 P.2d 90, 97–98; Farley v. State, 93 Okl. Cr. 192, 226 P.2d 1002, 1008; and State v. Douglas, 71 Wash.2d 303, 428 P.2d 535, 537–538.

5. See Zanetti Bus Lines, Inc. v. Logan, Wyo., 400 P.2d 482, 487; Berta v. Ford, Wyo., 469 P.2d 12, 16; and Orcutt v. State, Wyo., 366 P.2d 690, 694.